950 So.2d 188 (2006)
Charles Edward BIRRAGES, Jr., individually and on behalf of the Heirs of Charles Edward Birrages, Sr., Appellant,
v.
ILLINOIS CENTRAL RAILROAD COMPANY, Robert Bryant and Eddie Pickett, Appellees.
No. 2005-CA-00846-COA.
Court of Appeals of Mississippi.
October 3, 2006.
Rehearing Denied February 27, 2007.
*190 Quinton Labott James, Suzanne Griggins Keys, James Richard Davis, Isaac K. Byrd, Jackson, attorneys for appellant.
Charles Henry Russell, Benjamin Noah Philley, Charles T. Ozier, Jackson, attorneys for appellees.
Before MYERS, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. This wrongful death suit arose after a train collided with a dump truck. Tragically, the driver of the dump truck, Charles Birrages, Sr., died. Mr. Birrages's son, Charles Birrages, Jr., sued Illinois Central Railroad Co., the conductor, and the engineer for wrongful death. At trial, the defendants requested a directed verdict after Charles presented his case-in-chief. The Hinds County Circuit Court granted the defendants' motion for a directed verdict. Aggrieved, Charles appeals and raises three issues, listed verbatim:
I. WHETHER THE TRIAL COURT ERRED IN GRANTING *191 THE DEFENSE'S MOTION FOR DIRECTED VERDICT WITH RESPECT TO PLAINTIFF'S FAILURE TO MAINTAIN A PROPER LOOKOUT CLAIM BASED ON INSUFFICIENT PROOF TO SUSTAIN A CLAIM.
II. WHETHER THE TRIAL COURT ERRED IN RULING THAT PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BASED ON ITS CONCLUSION THAT THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT THE COLLISION WAS THE PROXIMATE CAUSE OF THE DEATH OF PLAINTIFF'S DECEDENT.
III. WHETHER THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S COUNSEL'S REQUEST TO ADDRESS THE COURT UNTIL THE JURY WAS DISMISSED, THEREBY DENYING PLAINTIFF THE OPPORTUNITY TO REQUEST THAT THE COURT ALLOW PLAINTIFF TO REOPEN HIS CASE TO ENTER PLAINTIFF'S DECEDENT'S DEATH CERTIFICATE INTO EVIDENCE.
Finding no error we affirm.

FACTS
¶ 2. On July 23, 2001, Mr. Charles Birrages, Sr. (Mr. Birrages) drove a dump truck through the railroad crossing at Meyers Road in Florence, Mississippi. At the same moment, an Illinois Central Railroad freight train proceeded through the railroad crossing. The train collided with the right side of Mr. Birrages's dump truck. Mr. Birrages died.
¶ 3. On September 26, 2001, Mr. Birrages's son, Charles Birrages, Jr., filed a wrongful death action in the Hinds County Circuit Court. Charles named three defendants: Illinois Central Railroad (ICR), Robert Bryant, the engineer, and Stephen Clay, the conductor.[1] By way of his complaint, Charles alleged that ICR negligently caused Mr. Birrages's death in that (a) Bryant and Clay failed to keep a proper lookout for motorists at the railroad crossing, (b) Bryant and Clay failed to sound the train's horn as required by law, and (c) Mr. Birrages's view was unreasonably and dangerously obstructed by vegetation. ICR filed an answer and denied liability. On January 10, 2005, the dispute proceeded to trial. On January 13, 2005, Charles rested. ICR moved for a directed verdict.
¶ 4. The circuit court granted ICR's motion for a directed verdict. One basis for the circuit court's decision was its opinion that Charles failed to introduce any evidence that Mr. Birrages died as a result of the collision. That is, the circuit court ruled that proximate cause of death was an essential element of liability in a wrongful death suit and that the record was completely void on the proximate cause of Mr. Birrages's death. In particular, the circuit court stated:
What we have in this case at this point in the record is evidence that Mr. Birrages' vehicle appeared out of nowhere onto the track and was hit. For all we know, for all the trier of fact knows, Mr. Birrages could have suffered from a heart attack, an aneurysm, that would have been the proximate cause of him running up on the track without attempting to slow down or brake. There is absolutely nothing in this record that indicates that the collision is, in fact, the cause or contributing cause of death. It would have been [a] very easy matter to *192 prove just by a death certificate, if not a doctor. But the record is completely void. There's nothing for the Court to instruct the jury on as far as proximate cause as no evidence has been presented concerning cause of death. . . .
Additionally, the circuit court held that Charles's improper lookout claim was insufficient as a matter of law because there was no evidence that improper lookout was a proximate cause or contributing factor in the collision.
¶ 5. Charles appeals the circuit court's decision to grant ICR's motion for directed verdict as to his improper lookout claim. Charles's vegetation obstruction claim and his claim that the train crew failed to sound the horn properly are not the subjects of this appeal.

STANDARD OF REVIEW
¶ 6. A motion for directed verdict challenges the legal sufficiency of the evidence. Read v. Southern Pine Elec. Power Assoc., 515 So.2d 916, 919 (Miss.1987). We conduct a de novo review of a trial court's decision to grant a motion for directed verdict. Alfa Mut. Ins. Co. v. Cascio, 909 So.2d 174(¶ 11) (Miss.Ct.App.2005). We must view the evidence in the record in the same light as the trial court. Id. That is, we must consider all evidence in the light most favorable to the non-moving party. M.R.C.P. 50(a). Said differently, we must concede to the non-moving party all favorable inferences that could reasonably arise from the evidence. Cascio, 909 So.2d at (¶ 12). Assuming the trial court granted a defendant's motion for directed verdict, if we review the evidence according to our standard of review and then conclude that no reasonable juror could find for the non-moving party, we must affirm. Id.
¶ 7. However, if we find that the evidence favorable to Charles, the non-moving party, and the reasonable inferences drawn from that evidence present a question for the jury, then the proper conclusion is to reverse the trial court. Tucker v. Riverboat Corp. of Mississippi, 905 So.2d 741(¶ 6) (Miss.Ct.App.2004). A trial court should submit an issue to the jury only if the evidence creates a question of fact on which reasonable jurors could disagree. Id.

ANALYSIS
¶ 8. Based on the nature of Charles's allegations, we reorder the issues. First, we consider whether the circuit court erred when it found that Charles presented insufficient evidence that Mr. Birrages died as a result of the collision.
I. WHETHER THE TRIAL COURT ERRED IN RULING THAT PLAINTIFF'S CLAIMS SHOULD BE DISMISSED BASED ON ITS CONCLUSION THAT THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT THE COLLISION WAS THE PROXIMATE CAUSE OF THE DEATH OF PLAINTIFF'S DECEDENT.
¶ 9. Charles claims the circuit court erred when it found that he presented no proof that the collision was the proximate cause of Mr. Birrages's death. The circuit court held:
in the case of [Wilks v. American Tobacco Co., 680 So.2d 839, 843 (Miss.1996)], the Mississippi Supreme Court [held] "it is essential as an element of liability under our wrongful death statute that the negligence complained of shall be the proximate cause or at least a directly contributing cause of the death which is the subject of the suit."
. . . .
So that is further authority for the court's decision concerning the improper lookout claim, but, also, there is a glaring *193 absence in this case concerning cause of death.
The Court in Wilks specifically held that the heirs of a deceased smoker cannot recover any damages for injuries in a wrongful death action where there was a complete failure to establish that the cause of death was proximately caused by that.
What we have in this case at this point in the record is evidence that Mr. Birrages' vehicle appeared out of nowhere onto the track and was hit.
For all we know, for all the trier of fact knows, Mr. Birrages could have suffered from a heart attack, an aneurysm, that would have been the proximate cause of him running up on the track without attempting to slow down or brake.
There is absolutely nothing in this record that indicates that the collision is, in fact, the cause or contributing cause of death. It would have been a very easy matter to prove just by a death certificate, if not a doctor.
But the record is completely void. There's nothing for the Court to instruct the jury on as far as proximate cause as no evidence has been presented concerning cause of death. So for that reason . . . the motion for a directed verdict will be granted as to all claims.
¶ 10. There can be no doubt that "[i]n order to prevail in a wrongful death action, the plaintiff must establish that the conduct of the defendant proximately caused the injury and death in question." White v. Yellow Freight Sys., 905 So.2d 506(¶ 9) (Miss.2004). It is undisputed that Charles did not introduce Mr. Birrages's autopsy report, expert medical testimony, a coroner's report or testimony, or even Mr. Birrages's death certificate. Regardless, Charles presents four arguments for his proposition that the circuit court erred.
¶ 11. First, Charles claims that the evidence in the form of testimony from Clay and Bryant, as well as the accident report, was sufficient to create a jury question. Specifically, Charles points out Clay's testimony that he was out of his seat in response to a communication from the dispatcher. Charles also notes that, according to Clay's testimony, Clay saw Mr. Birrages less than a second before the collision. The testimony to which Charles refers has absolutely nothing to do with the cause of Mr. Birrages's death. What is more, we are unable to see how the testimony to which Charles refers is even relevant to the cause of Mr. Birrages's death. Most assuredly, Clay's testimony indicates that there was a collision, but it does not prove that Mr. Birrages did not die prior to the collision or that Mr. Birrages died as a result of the collision. "The negligence, and not something else, must have been the cause which produced or directly contributed to the death." Berryhill v. Nichols, 171 Miss. 769, 773, 158 So. 470, 471 (1935). "And, as in other cases, this essential element must be proved as a reasonable probability." Id. "To prove no more than that it was a possibility is not a sufficient foundation for the support of a verdict or judgment." Id.
¶ 12. Regarding this specific argument, we can find no indication that the trial judge erred. Nothing in Clay's or Bryant's testimony suggests that Mr. Birrages actually died as a result of the collision. At this point in our analysis, we find no error in the trial judge's decision.

A. Failure to Raise the Issue
¶ 13. Next, Charles submits that the defendants never raised the lack of proximate cause of Mr. Birrages's death. According to Charles, "[s]ince the defense never raised this issue . . . the defense essentially waived this objection." Charles *194 also claims, "[p]laintiff's counsel did not realize this was an issue until after the trial judge made it an issue during his ruling."
¶ 14. Charles seems to claim that a trial judge has no authority to raise the lack of proof of an essential element as justification for granting a motion for directed verdict. However, Charles offers no authority for his argument. Arguments advanced on appeal must "contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record on." M.R.A.P. 28(a)(6). Failure to comply with M.R.A.P. 28(a)(6) renders an argument procedurally barred. See Read, 515 So.2d at 921. As such, this particular argument is procedurally barred.

B. Motion for Summary Judgment
¶ 15. Next, Charles points to ICR's unsuccessful motion for summary judgment. In its motion for summary judgment, ICR stated that it was undisputed that "Mr. Birrages was killed while attempting to negotiate the railroad crossing located on Myers Road in Florence, Mississippi." According to Charles, that amounted to ICR's stipulation that Mr. Birrages was killed in the collision.
¶ 16. ICR claims that its motion for summary judgment did not contain a statement that the collision was the proximate cause of Mr. Birrages's death. According to ICR, its motion for summary judgment only stated that Mr. Birrages was killed while attempting to negotiate the railroad crossing.
¶ 17. Further, ICR asserts that even if we view the statement within its motion for summary judgment as an admission or stipulation regarding the cause of Mr. Birrages's death, we should not weigh it in our consideration of whether the jury could conclude that the collision caused Mr. Birrages's death. ICR reasons that the jury would never even see that statement because Charles did not submit or read the alleged admission or stipulation to the jury. ICR cites numerous non-jurisdictional sources and states that it is "well-established that if a party intends to rely on a purported admission or stipulation made in a pre-trial pleading in order to meet his burden of proof at trial on an essential element of his case, that party must read that stipulation or admission into evidence so that the issue is properly before the jury."
¶ 18. Finally, ICR submits that Charles is barred from relying on this argument because Charles failed to raise the issue of whether the statement within the motion for summary judgment amounted to sufficient proof of the cause of Mr. Birrages's death. ICR claims that Charles waived the right to argue on appeal that its motion for summary judgment was an admission regarding proximate cause of death. ICR is correct. Failure to raise an issue in a trial court causes operation of a procedural bar on appeal. Bell v. State, 769 So.2d 247(¶ 8) (Miss.Ct. App.2000). Consequently, we will not consider this issue on appeal.

C. Accident Report
¶ 19. Next, Charles directs us to the accident report. ICR introduced the accident report into evidence during cross-examination of Loumiet. The accident report contained a box coded "K" as the investigating officer's indication that Mr. Birrages was killed in the collision. Charles submits that the accident report contained sufficient evidence that Mr. Birrages died as a result of the collision.
¶ 20. ICR claims the accident report does not contain a finding that the collision *195 caused Mr. Birrages's death. According to ICR, the "K" code merely indicates that Mr. Birrages was transported to the morgue following the accident. ICR further argues that the accident report is not sufficient proof that Mr. Birrages died as a result of the collision because Charles did not call the investigating officer to testify regarding his report. ICR reasons that Charles's failure to call the investigating officer created a lack of testimony to explain to the jury what the investigating officer meant when he placed a "K" in the accident report.
¶ 21. ICR also asserts that it introduced the accident report solely to impeach Loumiet's testimony that Mr. Birrages's sight was obstructed. Also, ICR claims that any finding regarding the cause of death contained within the accident report would amount to inadmissible hearsay. Finally, ICR claims the investigating officer would not have been qualified to render an opinion as to the cause of Mr. Birrages's death because the officer did not witness the collision and there was no indication that the officer was qualified as a forensic pathologist or a coroner.
¶ 22. According to our standard of review, we must view all reasonable inferences in favor of Charles. The accident report, which was introduced in evidence in unredacted form for the jury to review, contained an indication that Mr. Birrages was killed in the accident. Viewing the accident report in the light most favorable to Charles, we are of the opinion that a reasonable juror could conclude that the collision caused Mr. Birrages's death. Therefore, we must reverse the circuit court's finding that a directed verdict was appropriate based on Charles's failure to prove Mr. Birrages died as a result of the collision.
¶ 23. As to whether the accident report was admissible to prove Mr. Birrages died as a result of the collision, ICR did not challenge the accident report on the basis of the investigating officer's qualifications or the hearsay nature of the report. Consequently, the admissibility of the accident report is not before this Court.
¶ 24. Our analysis is not concluded by this finding. We still must resolve whether the circuit court erred when it found that ICR was entitled to a directed verdict based on Charles's failure to present sufficient evidence regarding his claims for failure to maintain a proper lookout.
II. WHETHER THE TRIAL COURT ERRED IN GRANTING THE DEFENSE'S MOTION FOR DIRECTED VERDICT WITH RESPECT TO PLAINTIFF'S FAILURE TO MAINTAIN A PROPER LOOKOUT CLAIM BASED ON INSUFFICIENT PROOF TO SUSTAIN A CLAIM.
¶ 25. In his complaint, Charles alleged that the train crew neglected to maintain a proper lookout for Mr. Birrages. The circuit court granted a directed verdict in favor of ICR. Charles submits that the circuit court erred in that decision.
¶ 26. In his complaint, Charles alleged that "[a]t the time and place in question, and under the circumstances that existed at the subject crossing, both the engineer and the conductor failed to maintain a proper lookout ahead for motorists approaching the crossing." During his opening statement, Charles's attorney told the jury that Charles would call Richard Beall as an expert witness and that Beall would testify that the conductor and the engineer "should have seen the truck a lot sooner than what they did. And they're going to admit that they only saw the truck when it got actually on the track and not at the point where they should have seen it."
*196 ¶ 27. Charles called Robert Bryant, the engineer for the train on the date of the collision, as an adverse witness. Bryant testified that both he and Clay, the conductor, had a duty to maintain a lookout for motorists. Bryant also testified that he and Clay maintained a proper lookout prior to the collision. According to Bryant, he had a very clear view of the crossing, but he never saw Mr. Birrages prior to the collision because Mr. Birrages did not pull up to the Myers Road crossing as the train approached. Instead, Bryant testified that Mr. Birrages's hood came up in front of the engine at the moment of impact. In other words, Mr. Birrages drove into the crossing immediately before the moment of impact.
¶ 28. During cross-examination by counsel for ICR, Bryant testified that he looked straight down the track prior to the collision. As to why he did not see Mr. Birrages before the collision, Bryant testified that Mr. Birrages did not stop at the crossing and that Mr. Birrages pulled out in front of him. Bryant further explained that, due to the height of the locomotive, he could not see immediately in front of him.
¶ 29. Charles also called Stephen Clay, the conductor, as an adverse witness. Clay corroborated Bryant's testimony in that Clay testified that both he and Bryant were responsible for looking out for the safety of motorists. Clay testified that the dispatcher contacted them and that he left his seat to respond on the radio located behind Bryant's position in the locomotive. According to Clay, he paused his communication with the dispatcher because Bryant was blowing the whistle. Because he was standing and Bryant was sitting, Clay saw Mr. Birrages's dump truck before the collision. Clay stated that he looked to his left and saw nothing, scanned to his right and saw nothing, and then looked back to his left  the direction from which Mr. Birrages entered the crossing. Clay testified that Mr. Birrages entered the path of the train less than one second before the collision. Clay estimated that Mr. Birrages was driving thirty to thirty-five miles per hour as he entered the crossing.
¶ 30. Clay testified that there was nothing he or Bryant could have done to prevent the collision. According to Clay, when they collided with Mr. Birrages's dump truck, the momentum of the locomotive pitched him forward into Bryant. Because he fell onto Bryant, Bryant was displaced from his position and was unable to engage the emergency brake until they could right themselves. Charles later called Beall, his expert witness. On direct, Beall testified that an engineer and a conductor have a duty to look out for motorists at a railroad crossing. Beall also testified that Bryant and Clay breached their duty to look out for Mr. Birrages. As to what Beall based his opinion upon, Beall testified:
Well, I'm basing it on the fact of what happened here. And, once again, the fact that when you have an emergency situation, when you have something that in a flash happens out in front of you, you don't wait seven seconds to put the train in emergency. You put the train in emergency now. Bang. It's too easy. Right then and there. You don't wait until the vehicle is wrapped around the front of the train being drug down the track. And you mentioned earlier about the testimony I heard. [Bryant] testified that, you know, he's feared for his life. Well, if he's feared for his life, here's a vehicle, a huge vehicle, wrapped around the front of the locomotive going down the track for another seven seconds before he places the train in emergency, if you believe that  [successful objection by the defense].
*197 Beall also based his opinion that Bryant and Clay breached their duty to watch for motorists on portions of Bryant's and Clay's testimony. Beall testified that Bryant and Clay were negligent because "they said they didn't see anything until [Mr. Birrages's dump truck] was actually on the crossing in front of them." Finally, Beall testified as follows:
Q. What significance do you attach to the fact that they said they didn't see anything until they actually saw the truck on the crossing in terms of whether or not they violated the rule to have a proper lookout?
A. If they were alert and attentive, they would have seen the vehicle coming out from behind the trees, and there's a couple of seconds worth of time there that something would have been done where the train would have been placed in emergency.
Q. Did these actions or lack of actions on the part of the conductor and engineer proximately cause or contribute to this collision?
A. It did because  and I didn't quite finish before you asked that question. The other reason is the fact that there was a conversation that was being placed with the train dispatcher at the time. So in all likelihood the conversation with the train dispatcher was happening coming up to the crossing. You can't hear talking to the dispatcher while you're talking on the radio. So the whistle was stopped blowing while they're having this conversation with the dispatcher. So, thus, that's why the whistle wasn't blown the last short and the last long. And that equates out to about 450 to 500 feet back that there was no whistle blowing.
¶ 31. Beall based his opinion that the engineer and conductor failed to maintain a proper lookout on the fact that (a) Bryant and Clay did not see Mr. Birrages's dump truck approach the crossing and (b) Bryant did not place the train in an emergency stop until after the collision. Beall also speculated that Clay talked with the dispatcher as the train approached the crossing and that Bryant stopped blowing the whistle so as to avoid interrupting Clay's conversation. However, whether Bryant blew the whistle during the approach is irrelevant to whether Bryant and Clay maintained a proper lookout for Mr. Birrages.
¶ 32. On cross-examination, Beall testified that, during his career as an engineer, there were occasions during which a motorist unexpectedly appeared at a crossing. Beall also testified that he collided with at least one motorist because he was unable to prevent the accident. Further, Beall testified that whether an engineer could stop a train depended on the speed and the grade of the track and that the Myers Road crossing approach is a downhill grade.
¶ 33. Later during cross-examination, Beall testified that Bryant and Clay were duty bound to keep their attention straight ahead, but if they had looked over to the left they would have seen Mr. Birrages when they were approximately one hundred to one hundred fifty feet from the crossing. Beall estimated that if Bryant and Clay had seen Mr. Birrages from one hundred to one hundred fifty feet from the crossing, they would have had approximately two seconds to place the train in an emergency stop. Beall admitted that Bryant would not have been able to stop the train before it hit Mr. Birrages. Based on this type "expert" testimony, it is exceedingly difficult to conclude that any failure to maintain a proper lookout could *198 have conceivably been a proximate or contributing cause of the collision. Additionally, counsel for ICR asked Beall to review the accident report. Beall noted that the accident report indicated that Mr. Birrages caused the collision due to "inattention." Finally, Beall testified that when Bryant placed the train in an emergency stop, the actual stopping distance of the train was either 2,600 or 2,700 feet.
¶ 34. Charles submits that he presented a jury question on his lookout claim in that Loumiet testified "that the sight distance at this crossing was not adequate for Mr. Birrages to be able to see the train to avoid a collision." Loumiet's testimony notwithstanding, whether Mr. Birrages could see the train as it approached has nothing to do with Bryant and Clay's duty to maintain a lookout for motorists. Loumiet's testimony was relevant towards Charles's claim that vegetation obstructed Mr. Birrages's view, not whether Bryant and Clay maintained a vigilant lookout.
¶ 35. Charles also points out Beall's testimony. In particular, Charles notes that Beall testified that Bryant and Clay had a duty to maintain a lookout for motorists and that they breached their duty. Charles claims that Beall "testified that the failure of the conductor and the engineer to maintain their duty to maintain a proper lookout proximately caused the accident." Examining the transcript, it is clear that Beall testified that Bryant and Clay breached their duty to maintain a proper lookout because they should have seen Mr. Birrages approach the crossing. Counsel for Charles then asked Beall whether Bryant and Clay's alleged failure to maintain a proper lookout proximately caused the accident. Beall simply answered, "[i]t did because. . . ." Beall then proceeded to clarify his answer to the previous question. Beall speculated that Bryant and Clay failed to maintain a proper lookout because Clay was engaged in a conversation with the dispatcher and that Bryant did not blow the whistle during Clay's conversation.
¶ 36. Despite the fact that Beall's opinion was a glaring mischaracterization of Clay's testimony that he ceased his conversation with the dispatcher because Bryant was blowing the whistle, Beall's testimony did not address Charles's negligent lookout claim. Charles's claim that Bryant failed to properly sound the whistle is not currently the subject of appeal, nor is Charles's vegetation obstruction claim. Whether Bryant sounded the whistle properly concerns his duty to warn motorists of the train's approach, not his duty to maintain a proper lookout for motorists. Additionally, whether ICR maintained the vegetation on its right of way concerns ICR's duty to provide a reasonably safe crossing for motorists, not Bryant's duty to maintain a proper lookout for motorists.
¶ 37. Not only that, Beall testified that Bryant and Clay breached their duty to maintain a proper lookout for Mr. Birrages even though he admitted that Bryant and Clay could not have done anything to prevent the collision in the split-second to two seconds that Mr. Birrages pulled out in front of the train. What is more, Beall did not offer any testimony that indicated just how Bryant and Clay's alleged breach of their duty to maintain a proper lookout was the proximate cause of Mr. Birrages's death. When asked whether Bryant and Clay's alleged breach of duty was the proximate cause of the collision, Beall answered that it was. Charles offered no other testimony that Bryant and Clay breached their duty to maintain a lookout for Mr. Birrages. A trial court should submit an issue to the jury only if the evidence creates a question of fact concerning which reasonable jurors could disagree. Tucker, 905 So.2d at (¶ 6). *199 There was no evidence from which a reasonable juror could find that Charles presented a prima facie case of negligence as to his failure to maintain a proper lookout claim. Accordingly, we find no error.
III. WHETHER THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S COUNSEL'S REQUEST TO ADDRESS THE COURT UNTIL THE JURY WAS DISMISSED, THEREBY DENYING PLAINTIFF THE OPPORTUNITY TO REQUEST THAT THE COURT ALLOW PLAINTIFF TO REOPEN HIS CASE TO ENTER PLAINTIFF'S DECEDENT'S DEATH CERTIFICATE INTO EVIDENCE.
¶ 38. Given our resolution of issues one and two, this issue is essentially moot. That is, even if we were to find that the trial judge erred, which for reasons that will become clear  we do not, Charles would only attempt to put forth evidence that Mr. Birrages died as a result of the collision. Because of our resolution of issue one, that is unnecessary. Because of our resolution of issue two, it would change nothing. However, we will analyze this issue for the sake of discussion only.
¶ 39. During the trial judge's announcement of his decision to grant ICR's motion for directed verdict, the trial judge stated:
There is absolutely nothing in this record that indicates that the collision is, in fact, the cause or contributing cause of death. It would have been a very easy matter to prove just by a death certificate, if not a doctor.
But the record is completely void. There's nothing for the Court to instruct the jury on as far as proximate cause as no evidence has been presented concerning cause of death. So for that reason ."
At that point, counsel for Charles interrupted the trial judge and said, "Your Honor." The trial judge stated, "no, sir" and continued with his ruling. The trial judge added, "For that reason the motion for a directed verdict will be granted as to all claims. All right. Bring the jury out."
¶ 40. Before the jury returned to the courtroom, Charles's attorney asked the trial judge, "May I be heard, Your Honor?" The trial judge answered, "After I get through with the jury." The trial judge then announced his decision and released the jury.
¶ 41. On appeal, Charles claims that the trial judge erred when he prevented Charles from moving to reopen his case-in-chief. Naturally, ICR disagrees and claims that Charles waived this argument because he did not try to reopen his case in that he merely asked "to be heard." ICR also notes that, after the trial judge dismissed the jury, the trial court judge allowed Charles to make a record on this issue so Charles could preserve the issue for appeal. According to ICR, Charles did not move to re-open his case-in-chief, did not make any proffer of evidence to establish proximate cause of death, and did not argue that the trial judge prevented him from moving to reopen his case-in-chief. ICR correctly submits that Charles made the same arguments he made in response to ICR's motion for directed verdict. Charles never requested to reopen his case. He merely asked to "make a record." It is possible that Charles felt that it would be pointless to ask to reopen his case after the trial judge dismissed the jury, since there would be no jury to hear his evidence, but the record does not show that to be the case. What is more, whether a party may reopen his case is subject to the trial judge's discretion. Zenith Radio Corp. v. Hazeltine Research Inc., 401 *200 U.S. 321, 331, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971). Given the fact that Charles never asked to reopen his case, we cannot find that the trial judge abused his discretion.
¶ 42. THE JUDGMENT OF THE SECOND JUDICIAL DISTRICT OF THE HINDS COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS AND ISHEE, JJ., CONCUR. BARNES, J., NOT PARTICIPATING.
NOTES
[1] Unless specified otherwise, we collectively refer to the defendants as "ICR."