[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1007 
 SUMMARY OF THE CASE ¶ 1. On November 5, 2004, a jury sitting before the George County Circuit Court found Hiram Bernard Larson guilty of sexual battery, a violation of Mississippi Code Annotated Section 97-3-95 (Rev. 2000). The circuit court sentenced Larson to a twenty year sentence in the custody of the Mississippi Department of Corrections with five years suspended and fifteen years to serve. Following Larson's unsuccessful motion for new trial, Larson appeals and raises four issues, listed verbatim:
 I. WHETHER THE TRIAL COURT ERRED IN ADMITTING, OVER OBJECTION, THE HEARSAY TESTIMONY OF THE STEP-GRANDMOTHER, MOTHER AND EXAMINING PHYSICIAN IN THIS CASE.
 II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE CARTE BLANCHE TESTIMONY, OVER OBJECTION, OF OTHER ALLEGED TOUCHINGS BY THE DEFENDANT TO HIS EXTREME PREJUDICE, REQUIRING REVERSAL.
 III. WHETHER THE STATE'S KNOWING FAILURE TO PROVIDE IN DISCOVERY, THE KINSHIP RELATIONSHIP BETWEEN DR. TERRA MALLETT AND [MICHELLE PHILLIPS] IS MATERIAL NEW EVIDENCE, REQUIRING REVERSAL.
 IV. WHETHER THE TRIAL JUDGE'S SUMMARY DISMISSAL OF THE DEFENDANT'S MOTION FOR A NEW TRIAL, AND THE INCORRECT DENIAL BY THE TRIAL JUDGE OF THE DEFENDANT'S APPEAL BOND DEMONSTRATES AN ABUSE OF DISCRETION ON THE PART OF THE TRIAL JUDGE, REQUIRING REVERSAL.
Finding no error, we affirm.
 FACTS ¶ 2. To fully appreciate the events surrounding this case, it is necessary to briefly summarize the somewhat complex familial relationships involved. Laura Phillips, the victim, is the daughter of Deborah *Page 1008 
Harris and Edward Phillips.[1] Deborah and Edward divorced when Laura was very young. They both subsequently re-married other people. Deborah married Thomas Harris and Edward married Michelle Phillips.
 ¶ 3. Laura's grandparents and step-grandparents played a large role in this case. Laura was very close to Thomas Harris's mother, Phyllis Harris. Additionally, Larson is technically Laura's grandfather. Laura's mother, Deborah, is Angela Larson's natural daughter, though Larson is not Angela's biological father. However, Larson adopted Deborah when she was nine years old. Thus, Larson is technically Laura's maternal grandfather.
 ¶ 4. The events that set Larson's appeal into motion took place during late December of 2000. At that time, Laura was ten years old. On Wednesday, December 20, 2000, Laura went to Angela and Bernard Larson's house after school. Laura did not feel well that day, so she took a nap. Angela's neck hurt, so she decided to lie down with Laura. After a little while, Angela got up to answer the telephone. Laura remained in the bed. What happened next is pivotal.
 ¶ 5. All parties agreed that Larson woke Laura up from her nap and that Larson was alone when he woke her up. However, Laura's version and Larson's version varied drastically. According to Laura, she woke up when she felt Larson's hand underneath her underwear "feeling her private area." Laura elaborated that Larson felt her "lower private area" and that "[h]e was messing with it, with his hands, fingers." Laura would later testify that Larson, "felt, and his finger — his finger went in me, and that was the first time that had ever happened, because he had done stuff like that a few times before, but that's the furthest it went."
 ¶ 6. Larson disputed Laura's version of events. According to Larson, he did not touch Laura inappropriately. Larson explained that he went in the bedroom and "popped [Laura] up on the butt." When asked to elaborate, Larson testified that he "patted [Laura] on the butt" and that he did not hit her hard.
 ¶ 7. After Laura left and went home, she struggled with whether she should tell anyone about her experience with Larson. She testified that she was hesitant to tell anyone out of concern that she would hurt her mother and the rest of her family. However, she decided to tell someone because she "[knew] it was bad, and [she] want[ed] it to stop, and [she] didn't want it to happen to [her] little sister or anybody else." To that end, she decided to write a letter to her step-grandmother, Phyllis Harris. Laura shut herself inside her closet and wrote a letter to Phyllis.
 ¶ 8. In that letter, Laura did not directly implicate Larson. Instead, she wrote that she had a friend who needed help. At trial, Laura testified that she was scared and embarrassed, so it was easier to make "a friend" the subject of her letter, rather than herself. Still, Laura also wrote a message to indicate that the letter contained "clues" to her true meaning. In her letter, Laura pointed out that any such "clues" would be marked with a "c."
 ¶ 9. Some of Laura's clues were more direct than others. For example, when Laura wrote "I have a friend," she placed a "c" near it. Next to that "c" Laura wrote "me" to indicate that she wrote about herself, rather than a friend. Laura also wrote, "[r]emember that you told me about the pastor. It's not him, though. Look for my clues." At trial, Laura explained *Page 1009 
that, when she was younger, Phyllis told her "that if anybody tried to do anything to me, to tell. It don't matter who it was. Even if it was a pastor, it didn't matter."
 ¶ 10. Another clue appeared in Laura's statement, "my step mom smokes, and I'm allergic to smoke, and it makes me sick." In small writing above that sentence is the notation "Paw-Paw." At trial, Laura testified that she referenced that what was going on with Larson, her Paw-Paw Bernard, made her sick. After she finished her letter, Laura put it in her backpack and took it to Phyllis the next day.
 ¶ 11. Laura was very emotional when she gave Phyllis the letter. Both Laura and Phyllis testified that Laura "threw" the letter at Phyllis and ran into a bedroom. Phyllis read the letter and then went to talk to Laura. Phyllis quickly realized that Laura did not write about "a friend." Laura finally told Phyllis what the letter was about. According to Phyllis Harris's trial testimony, Laura told her that Larson "was messing with her" when she woke up from her nap.
 ¶ 12. Phyllis called Thomas Harris, Laura's step-father, and relayed her conversation with Laura. Thomas Harris left work and drove to get Deborah, who was also working at the time. At trial, Deborah testified, "[Tom] . . . come to my work and told me something bad happened, and I had to leave right ten [sic]." When Deborah pressed Thomas, he told her, "something has happened to [Laura], . . . she's been messed with . . . your daddy has messed with [Laura]." Thomas then took Deborah to see Laura at Phyllis's house. Deborah read the letter Laura wrote to Phyllis and then she talked to Laura.
 ¶ 13. At trial, Deborah testified that Laura told her Larson "put his hands in her panties. She was at Grandma Angie's, and she laid down to take a nap, and she woke up, and he was kneeling in front of her on the bed, and his hands was inside her panties." Laura also told Deborah that Larson had touched her "several times before."
 ¶ 14. Deborah confronted Larson that same day. Deborah's testimony at trial did not indicate whether Larson admitted or denied that he touched Laura. Deborah did not speak to Larson afterwards and had not spoken to him at the time of trial.
 ¶ 15. Sometime between the day Deborah confronted Larson, which should have been approximately December 21, 2000, and Christmas Day of 2000, Angela visited Deborah at her house and gave Deborah a letter from Larson. Though we have corrected many capitalization and punctuation errors, that letter stated:
 For the past year or so I have been living a lie. I have lied to God, I have lied to Angie. I have been to the boats, spent our savings lied about it. I have did things that no so called good person would do.
 I am proud of [Laura] for telling. I have not felt this kind of hurt since my mother died when I was eight years old.
 I went to church and was Baptized for the remission of sin Friday night. Not to make me feel better but to face the truth if I had not — my heart had grown so hard that I would not have took the blame, and I know that I could not have prayed for all my family that I have destroyed because God had heard so many lies from me.
 Don't blame your mother for anything. She is the most loving Christian woman on earth. If I had not been honest with her she was going to divorce me. I don't won't or expect you to *Page 1010 
forgive me but love your mother and sister. They need it.
 The Lord and the Devil will not live in the same body. I was letting Satan rule my life and knew it. The Lord brought me down.
 Please let the Lord be the main thing in all your lives.
 ¶ 16. Immediately after Angela gave Larson's letter to Deborah, Angela left Larson. Angela stayed with Deborah for approximately a month. When she left Deborah's house, Angela visited relatives and lived in various other places for a few months while she decided what to do about her family. Eventually, Angela and Larson reconciled.
 ¶ 17. Meanwhile, Laura finally became comfortable enough to speak with others about her experience with Larson. On April 16, 2001, Deborah visited Al Hillman, an investigator with the George County Sheriff's Department. Deborah reported that Larson touched Laura inappropriately. Investigator Hillman advised Deborah to take Laura to see a doctor. Investigator Hillman arranged for an appointment with a forensic interviewer at the Children's Advocacy Center and he notified the Green County Department of Human Services.
 ¶ 18. On April 17, 2001, Deborah and Michelle Phillips, Laura's step-mother, took Laura to see Dr. Terra Mallett, Laura's pediatrician. Dr. Mallett asked Laura if she knew why she was there, Laura answered, "he touched me in some inappropriate ways." At trial, Dr. Mallett testified that Laura told her that it was Larson who touched her inappropriately and that "it happened a lot." Dr. Mallett's notes from that visit reflect that Laura told Dr. Mallett that Larson touched her "down there" and that Laura indicated that "down there" referred to "between her legs in her groin." When Dr. Mallett asked Laura if Larson touched her on the outside, Laura answered, "no, on the inside, too."
 ¶ 19. Dr. Mallett also examined Laura during that visit. At trial, Dr. Mallett testified that Laura's "hymen had an abnormal finding that was consistent with trauma." Dr. Mallett could not opine as to what caused that trauma, but she was able to say that the trauma was consistent with the history Laura gave her. During cross-examination of Dr. Mallett, counsel for Larson pointed out that Deborah and Michelle may have been present when Laura told Dr. Mallett the history of the case. Dr. Mallett referred to the trauma to Laura's hymen as a "healed tear." Dr. Mallett elaborated that Laura suffered a "penetrating injury."
 PROCEDURAL HISTORY ¶ 20. On November 28, 2001, the George County Grand Jury returned an indictment against Larson and charged him with sexual battery in violation of Section 97-3-95(1 )(d). On January 14, 2002, Larson executed a waiver of arraignment and pled not guilty to the charge.
 ¶ 21. Trial commenced on November 1, 2004. As mentioned, on November 5th, the jury found Larson guilty of sexual battery. The circuit court did not sentence Larson immediately. Instead, the circuit court requested a pre-sentence report. On December 1, 2004, the circuit court conducted Larson's sentencing hearing. After statements from numerous people, including many members of Larson's family, torn apart in support of either Larson or Laura, the circuit court sentenced Larson to twenty years with five years suspended and fifteen to serve.
 ¶ 22. On December 8, 2004, Larson filed a motion for new trial and raised seven points of contention. On April 18, *Page 1011 
2005, the circuit court conducted a hearing on Larson's motion for new trial. That same day, the circuit court overruled Larson's motion. Larson appeals.
 ANALYSIS
I. WHETHER THE TRIAL COURT ERRED IN ADMITTING, OVER OBJECTION, THE HEARSAY TESTIMONY OF THE STEP-GRANDMOTHER, MOTHER AND EXAMINING PHYSICIAN IN THIS CASE.
 ¶ 23. After testimony from the State's first witness, the circuit court conducted a "tender years hearing" to determine whether it would permit presentation of testimony from multiple State witnesses as to what Laura told them regarding Larson's inappropriate touching. The State called the following witnesses during that hearing: (a) Deborah, (b) Phyllis, and (c) Joanne Daniels, who conducted a forensic interview of Laura at the South Mississippi Child Advocacy Center. Additionally, the circuit court reviewed a videotape of Daniels's interview of Laura. At the conclusion of the hearing, the circuit court concluded that the State would be allowed to present hearsay testimony from various witnesses as to what Laura told them about Larson touching her on December 20th.
 ¶ 24. Larson claims that the circuit court erred in its decision. We interpret Larson's argument as an attack on the sufficiency on the indicia of reliability of Laura's statements. Larson points out the time period between the incident on December 20, 2000, and Deborah's report on April 16, 2001. Larson insinuates that, during that time period, Deborah, Phyllis, and Laura arrived at a "common and consistent story." At trial, Deborah explained the delay in reporting when she testified that Laura was not comfortable talking to authorities about the events of December 20th. According to Larson, Deborah's explanation "just does not wash." Finally, Larson addresses Laura's letter and her use of an "I have a friend" approach. Larson suggests that Laura's use of that approach creates doubt as to the credibility of her allegation.
 ¶ 25. We review a circuit court's decision to admit testimony under the tender years exception as we review other issues regarding admission of testimonial evidence. "The admission of testimonial evidence is within the sound discretion of the trial court, which will be found in error only if the ruling was an abuse of discretion." Elkins v. State,918 So.2d 828 (¶ 13) (Miss.Ct.App. 2005). As usual, the circuit court must exercise its discretion pursuant to the rules of evidence. Id. Even if we find that the circuit court erred in admitting evidence, we will not reverse the circuit court unless that error affected a substantial right of the complaining party. Id.
Pursuant to M.R.E. 803(25):
 A statement made by a child of tender years describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness: provided, that when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
 ¶ 26. When a circuit court determines whether testimony will be admissible under the tender years exception, the circuit court must assess first whether the *Page 1012 
child falls into the category of one who is of "tender years."Marshall v. State, 812 So.2d 1068 (¶ 20) (Miss.Ct.App. 2001). There is a rebuttable presumption that a child under the age of twelve is of tender years. Id.
The relevant time to determine whether the tender years exception applies is the child's age at the time the child made the relevant statement, rather than the child's age at the time of trial. Id. Laura was ten when she made the relevant statements. Accordingly, Laura was of tender years and her statements fall within the tender years exception.
 ¶ 27. Next, a circuit court must determine whether an out-of-court statement contains a "substantial indicia of reliability." M.R.E. 803(25); Marshall,812 So.2d at 1075 (¶ 21). The circuit court must consider a number of factors in its overall determination. The comment to M.R.E. 803(25) lists twelve factors which the circuit court should examine to determine whether substantial indicia of reliability exist.
 (1) whether there is an apparent motive of declarant to lie; (2) the declarant's general character; (3) whether more than one person heard the statements; (4) whether the statements were spontaneous; (5) the timing of statements; (6) the relationship between the declarant and the witness; (7) the possibility of faulty recollection by the declarant is remote; (8) certainty that the statements were made; (9) the credibility of the witness testifying about the statements; (10) the declarant's age or maturity; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declarant's age, knowledge and experience made it unlikely that the declarant fabricated.
Elkins, 918 So.2d at 833 (¶ 14). The circuit court must ultimately determine "whether the child declarant was particularly likely to be telling the truth when the statement was made." Marshall, 812 So.2d at 1075 (¶ 21).
 ¶ 28. The circuit court conducted a hearing to determine whether sufficient indicia of reliability were present. The circuit court found that "all the 12 factors have been met, and there is a sufficient indicia of reliability." Larson raises questions as to the timing of the allegation and Laura's use of the "I have a friend" approach in her letter to Phyllis. We can find nothing about Laura's use of the "I have a friend" approach that, in and of itself, creates doubt as to Laura's credibility. It seems entirely reasonable that a child of tender years would use such an approach, given the message, circumstances, and context of the communication. Without more, use of the "I have a friend" approach, does not cast doubt upon Laura's credibility. As for the approximate four-month delay in reporting, out of the countless possibilities in existence, conspiracy to arrive at a common story is among those infinite possibilities. However, without any such evidence of that occurrence, we cannot conclude that the circuit court erred when it declined to find that the delay overcame the otherwise sufficient indicia of reliability. Accordingly, we do not find that the circuit court committed reversible error when it permitted testimony under M.R.E. 803(25).
II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE CARTE BLANCHE TESTIMONY, OVER OBJECTION, OF OTHER ALLEGED TOUCHINGS BY THE DEFENDANT TO HIS EXTREME PREJUDICE, REQUIRING REVERSAL.
 ¶ 29. During Laura's trial testimony, the prosecution asked her if she remembered how Larson touched her on December 20, 2001. Laura answered, "[h]e *Page 1013 
felt, and his finger — his finger went in me, and that was the first time that had ever happened, because he had done stuff like that a few times before, but that's the furthest it went." The prosecution then asked Laura whether Larson touched her inappropriately prior to December 20, 2001 and how had he touched her. Laura answered that Larson had touched her inappropriately before December 20, 2001. At that point, counsel for Larson objected, but the circuit court overruled that objection. Laura proceeded to testify that Larson touched her on a few occasions over a "long period of time." Further, Laura testified that "it started off as just like rubbing, then it got worse and worse" and that Larson always touched her at Angela's house when Angela was outside. When Laura testified that Larson started touching her when she was seven or eight, counsel for Larson requested a continuing objection.
 ¶ 30. In this issue, Larson claims the circuit court erred when it allowed testimony that Larson touched Laura inappropriately on occasions other than the one raised in the indictment. True enough, Larson was charged with one incident of sexual battery. Larson claims that the State repeatedly elicited testimony of other alleged inappropriate touchings in an effort to portray him as a "bad" person. We stated our familiar standard of review regarding admission of evidence in the issue above. There is no reason to repeat it here.
 ¶ 31. Larson does not address his argument towards Laura's testimony of other acts of inappropriate touching. Instead, Larson references testimony from Deborah and Phyllis. In particular, Larson references this particular exchange during Deborah's testimony:
 Q. Do you know of anything other than her telling about sexual abuse that she told?
 Counsel for Larson: To which we object.
 The Court: Overruled.
 Q. If you know?
 A. No, sir. The only thing she ever told me about him was the sexual abuse.
 Q. Do you mean bad about him?
 A. Bad. That's the only thing bad she's ever said about him.
As for Phyllis, Larson references her testimony that Laura:
 said that like times when she would come home from school — I think she would get off the bus at their house, and she said she would be laying down on the couch and she would go to sleep, you know, be asleep, and she would be woken up, and that her Paw-Paw Bernard would be there with his hand down in her pants and stuff.
 ¶ 32. According to Mississippi Rule of Evidence 404(b):
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
Determining whether to admit evidence under Rule 404(b) requires a two part analysis. "The evidence offered must (1) be relevant to prove a material issue other than the defendant's character; and (2) the probative value of the evidence must out-weigh the prejudicial effect." Cratuford v. State,754 So.2d 1211 (¶ 23) (Miss. 2000). Part two is necessary because M.R.E. 403 is the ultimate filter through which all *Page 1014 
otherwise admissible evidence must pass. Id. Pursuant to M.R.E. 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."
 ¶ 33. We do not find that the circuit court erred. "Evidence of uncharged misconduct or other offenses is inadmissible where the only purpose for the evidence is to raise the `forbidden inferential sequence,' i.e., to suggest that because the defendant engaged in other misconduct or committed another offense, he probably committed the offense for which he is then on trial." King v. State, 857 So.2d 702 (¶ 122) (Miss. 2003). However, prior sexual acts of an accused are admissible to show the defendant's lustful disposition towards the victim and the probability of the defendant's having committed the offense charged. Henry v. State,816 So.2d 443 (¶ 15) (Miss.Ct.App. 2002). As such, the circuit court did not err when it permitted Deborah and Phyllis to testify that Laura told them that Larson touched her inappropriately prior to December 20, 2000. It is important to note that Larson did not object to their testimony on the basis that it was impermissible hearsay.
 ¶ 34. Furthermore, the testimony of which Larson complains was unquestionably prejudicial. Even so, we cannot say that the prejudice outweighed the evidence's probative value. The testimony was probative of Larson's lustful disposition towards Laura and it was also probative as to the probability of Larson's having committed sexual battery on December 20, 2000. Accordingly, we affirm.
III. WHETHER THE STATE'S KNOWING FAILURE TO PROVIDE IN DISCOVERY, THE KINSHIP RELATIONSHIP BETWEEN DR. TERRA MALLETT AND [MICHELLE PHILLIPS] IS MATERIAL NEW EVIDENCE, REQUIRING REVERSAL.
 ¶ 35. On April 17, 2001, Deborah and Michelle Phillips, Laura's stepmother, took Laura to see Dr. Terra Mallett, Laura's pediatrician. Laura told Dr. Mallett that she was there because Larson "touched [her] in some inappropriate ways." Laura also told Dr. Mallett that Larson touched her "down there" and that "down there" referred to "between her legs in her groin." When Dr. Mallett asked Laura if Larson touched her on the outside, Laura answered, "no, on the inside, too." Laura also told Dr. Mallett that Larson touched her inappropriately "a lot."
 ¶ 36. When Dr. Mallett examined Laura, she concluded that Laura's "hymen had an abnormal finding that was consistent with trauma." Dr. Mallett referred to that trauma as a "healed tear" consistent with a "penetrating injury." Dr. Mallett could not opine as to exactly what could have caused that trauma. However, Dr. Mallett testified that the "healed tear" from the "penetrating injury" was consistent with the history Laura gave her regarding Larson's touching that occurred on December 20, 2000.
 ¶ 37. In this issue, Larson claims that the State withheld discoverable material and that a new trial is necessary as a result. In particular, Larson claims the State withheld that Dr. Terra Mallett, the physician who examined Laura, was related to Laura's stepmother, Michelle Phillips. The record does not indicate exactly how Dr. Mallett is related to Michelle. During arguments on Larson's motion for new trial, the State indicated that Dr. Mallett is Michelle's first cousin. Still, the *Page 1015 
State did not know if that was correct. In any event, Larson claims that he would have sought to exclude Dr. Mallett as a witness had he been aware of her relationship to Michelle Phillips. Larson also claims that, failing exclusion, he would have sought a cautionary instruction.
 ¶ 38. At the outset, we note that Larson cites no authority mandating discovery of familial relationships. Even so, Rule 9.04 of the Uniform Circuit and County Court Rules governs discovery. According to Rule 9.04, the prosecution must disclose the following evidence:
 1. Names and addresses of all witnesses in chief proposed to be offered by the prosecution at trial, together with a copy of the contents of any statement, written, recorded or otherwise preserved of each such witness and the substance of any oral statement made by any such witness;
 2. Copy of any written or recorded statement of the defendant and the substance of any oral statement made by the defendant;
 3. Copy of the criminal record of the defendant, if proposed to be used to impeach;
 4. Any reports, statements, or opinions of experts, written, recorded or otherwise preserved, made in connection with the particular case and the substance of any oral statement made by any such expert;
 5. Any physical evidence and photographs relevant to the case or which may be offered in evidence; and
 6. Any exculpatory material concerning the defendant.
URCCC 9.04(A).
 ¶ 39. Nothing in URCCC 9.04(A)(1)-(6) grants Larson a right to discovery of familial relationships between an expert witness and a victim's stepmother. Dr. Mallett's kinship relationship to Michelle is not covered in 9.04(A)(1), as that subsection applies to names and statements of witnesses in chief who the prosecution proposes to offer at trial. Similarly, Dr. Mallett's kinship relationship is obviously not contemplated in 9.04(A)(2) or 9.04(A)(3). Those subsections would apply to any statement made by Larson and Larson's criminal record, if the State proposed to use his criminal record to impeach. Nor would Dr. Mallett's relationship to Michelle be discoverable under 9.04(A)(4), though that subsection would apply to any report, statement, or opinion of Dr. Mallett. Clearly, Dr. Mallett's relationship to Michelle is not physical evidence, as contemplated under 9.04(A)(5). Dr. Mallett's relationship to Michelle is not "exculpatory material concerning" Larson. At best, Dr. Mallett's relationship to Michelle could raise questions of whether Dr. Mallett's opinion should be somehow diminished due to her bias towards Michelle. Those questions should only arise if it appears that Michelle influenced Dr. Mallett's expert opinion.
 ¶ 40. There is a catch-all provision to Rule 9.04(A). "Upon a showing of materiality to the preparation of the defense, the court may require such other discovery to the defense attorney as justice may require." URCCC 9.04(A). Even applying the language of the catch-all provision, we still decline to find that Larson is entitled to a new trial.
 ¶ 41. Dr. Mallett did not testify that Larson, in fact, touched Laura inappropriately. Instead, Dr. Mallett testified that Laura told her that Larson touched her inappropriately. Further, Dr. Mallett testified that, in her expert opinion per her examination of Laura, she found injuries consistent with Laura's version of events that occurred on December 20, 2001. We can find no means by which Dr. Mallett's *Page 1016 
familial relationship to Michelle somehow influenced or tainted her expert medical and professional opinion. Dr. Mallett did not offer an ultimate conclusion as to whether Larson touched Laura. Dr. Mallett did not vouch for Laura's credibility. We fail to see how the State's failure to provide Dr. Mallett's relationship to Laura's stepmother prejudiced Larson. True enough, Dr. Mallett's testimony prejudiced Larson. However, the State's failure to tender Dr. Mallett's relationship to Michelle did not contribute to that prejudice.
 ¶ 42. What is more, Larson had several opportunities to discovery Dr. Mallett's relationship to Michelle. Larson could have simply talked to Dr. Mallett in advance of trial. Larson had ample time to investigate the facts of the case. Larson cross-examined Dr. Mallett. At no point did Larson ask Dr. Mallett whether she was related to any of the relevant parties to this matter. Accordingly, we can find no reversible error as a result of Larson's allegation.
IV. WHETHER THE TRIAL JUDGE'S SUMMARY DISMISSAL OF THE DEFENDANT'S MOTION FOR A NEW TRIAL, AND THE INCORRECT DENIAL BY THE TRIAL JUDGE OF THE DEFENDANT'S APPEAL BOND DEMONSTRATES AN ABUSE OF DISCRETION ON THE PART OF THE TRIAL JUDGE, REQUIRING REVERSAL.
 ¶ 43. Larson raises two entirely separate arguments under this heading. At the same time, Larson also seems to argue that the cumulative effect of the trial judge's decisions to overrule both his motion for new trial and his motion for appeal bond somehow combine to create cumulative error. We separate Larson's arguments regarding his motion for new trial and his appeal bond. If we find any error at all, we will then consider if a cumulative effect results.
 A. Motion for New Trial ¶ 44. A motion for a new trial challenges the weight of the evidence. Verner v. State, 812 So.2d 1147 (¶ 6) (Miss.Ct.App. 2002). We may only reverse the circuit court's decision if the circuit court abused its discretion when it overruled Larson's motion for a new trial. Smith v.State, 868 So.2d 1048 (¶ 11) (Miss.Ct.App. 2004).
 ¶ 45. Larson's argument on this issue is as follows:
 An examination of the record in [Larson's] new trial hearing of April 18, 2005, shows that though lip service was given to the 7 issues as raised, there was really no meaningful consideration of the issues raised. This was particularly acute on the new evidence claim as to the kinship of Dr. Mallett and [Michelle Phillips], as discussed above. To be sure, there is the overriding presumption that all evidence offered by the State is accepted as true. But what is the situation when the State withholds either evidence or information that may be exculpatory? The only proper remedy is a new trial.
(citations omitted).
 ¶ 46. We considered whether any reversible error resulted from the State's failure to make Larson aware of the kinship relationship between Dr. Mallett and Michelle Phillips in issue three, above. We found no error in that issue. There is no reason to revisit that issue.
 ¶ 47. Applying benefit of the doubt as to whether Larson raised a challenge to the weight of the evidence in his argument under this heading, we cannot say that the circuit court erred when it overruled his motion for new trial. Laura testified that Larson touched her inappropriately *Page 1017 
and that he digitally penetrated her vagina. Through the course of her examination, Dr. Mallett found physical evidence that corroborated Laura's version of events. Larson and his wife, Angela, contested Laura's version of events and cast doubt on Laura's credibility. Even if Deborah and Phyllis did not present hearsay testimony under the tender years exception, the testimony of a single uncorroborated witness can sustain a conviction even though there may be more than one witness testifying to the contrary. Verner, 812 So.2d at (¶ 7). The jury weighed the credibility of the various witnesses and determined that Laura was more credible. When there is conflicting testimony, the jury determines which witnesses are more credible. Bessent v. State,808 So.2d 979 (¶ 21) (Miss.Ct.App. 2001).
 ¶ 48. We are prohibited from re-weighing the facts in this case to, in effect, circumvent the jury to substitute our own determination of credibility. Smith, 868 So.2d at (¶ 11). Instead, "this Court must consider all the evidence, not just that supporting the case for the prosecution, in the light most consistent with the verdict, and give the State all favorable inferences which may be drawn from that evidence."Fleming v. State, 732 So.2d 172 (¶ 38) (Miss. 1999). Accordingly, we affirm the circuit court's decision.
 B. Appeal Bond ¶ 49. On November 5, 2004, the jury found that Larson committed sexual battery against Laura when she was ten years old. The circuit court sentenced Larson on December 1, 2004. Larson filed a motion for new trial on December 8, 2004. The circuit court heard Larson's motion for new trial on April 18, 2005. After the circuit court overruled Larson's motion for new trial, counsel for Larson made an ore tenus motion for an appeal bond. The State objected to Larson's request for a bond. The circuit court stated: "I'll defer ruling on that at this time. I'll give you two weeks, both sides, to give me one or two cases that might be helpful." The circuit court added, "I'm not asking for a brief. I'm not asking you to do a lot of extra work. Just give me a little memo and a few cases and let me look at it and see what I can do." The record contains a letter from the assistant district attorney. Within that letter, the assistant district attorney placed the circuit court on notice that he had tendered authority for his position that Larson should not receive bail pending appeal. The record also contains copies of authority as mentioned in the assistant district attorney's letter. The record does not contain any indication that Larson tendered any authority on the issue. In any event, on May 7, 2005, the circuit court entered an order and denied Larson's request for an appeal bond.
 ¶ 50. Larson claims the circuit court erred. We disagree. Mississippi Code Annotated Section 99-35-115 (Rev. 2000) governs whether a convicted person is entitled to bail pending appeal. See URCCC 12.01. On March 14, 2005, Section 99-35-115(1) was amended to reflect that "[a] person convicted of . . . sexual battery of a minor . . . shall not be entitled to be released from imprisonment pending an appeal to the Supreme Court." Larson requested an appeal bond on April 18, 2005. The amended language of Section 99-35-115(1) certainly applied at that time. Larson claims that section 99-35-115(1), as applied by the circuit court, amounts to an ex post facto law. However, Larson did not advance that argument in his initial brief and the record does not indicate that Larson ever placed that theory before the circuit court. This Court cannot assume something outside of the record. See, e.g., Brown v. State,338 So.2d 1008, 1010 (Miss. 1976); *Page 1018 Knight v. State, 360 So.2d 674, 678 (Miss. 1978). Without any indication that Larson advanced his theory prior to his reply brief, we cannot assume Larson presented his theory before the circuit court. Fundamental to appellate review is the requirement that the trial court first be presented the issue for resolution before we accept it. See M.R.A.P. 28(a)(3). Trial courts should not be reversed based on issues never presented to them. Billiot v. State,454 So.2d 445, 455 (Miss. 1984) (holding that an appellant who failed to raise an objection in a trial court waived his right to object on appeal, notwithstanding the constitutional nature of the claim). As such, Larson's argument is procedurally barred. Accordingly, we cannot say that the circuit court erred when it overruled Larson's request for appeal bond.
 C. Cumulative Error ¶ 51. As we have found no errors, there is no cumulative effect. We find no merit to Larson's claim of cumulative effect of errors.
 ¶ 52. THE JUDGMENT OF THE GEORGE COUNTY CIRCUIT COURTOF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF TWENTY YEARS INTHE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHFIVE YEARS SUSPENDED AND FIFTEEN TO SERVE IS AFFIRMED. ALL COSTSOF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ISHEE, JJ. CONCUR.
[1] We substitute aliases to maintain the victim's anonymity.