994 So.2d 792 (2008)
Reginald Vernell ROGERS, Appellant
v.
STATE of Mississippi, Appellee.
No. 2006-KA-00064-COA.
Court of Appeals of Mississippi.
March 18, 2008.
Rehearing Denied September 2, 2008.
Certiorari Denied November 20, 2008.
*794 James L. Penley, Vicksburg, attorney for appellant.
Office of the Attorney General, by Laura Hogan Tedder, attorney for appellee.
Before LEE, P.J., IRVING and ROBERTS, JJ.
ROBERTS, J., for the Court.

SUMMARY OF THE CASE
¶ 1. A jury sitting before the Warren County Circuit Court found Reginald Vernell *795 Rogers guilty of manslaughter and two counts of aggravated assault. Incident to the manslaughter conviction, the circuit court sentenced Rogers to twenty years in the custody of the Mississippi Department of Corrections. Additionally, the circuit court sentenced Rogers to ten years for one aggravated assault conviction and five years for the other aggravated assault conviction. The circuit court set the sentences to run consecutively, for a total sentence of thirty-five years. Aggrieved, Rogers appeals and raises five issues, which we have reordered slightly, but they are otherwise listed verbatim:
I. THE STATE PROVED THE CRIME OF MURDER, PREJUDICING THE JURY TO FIND THE DEFENDANT GUILTY OF MANSLAUGHTER.
II. ROGERS['S] RIGHT OF SELF[-]DEFENSE WAS TERMINATED.
III. THAT A JUROR WAS NOT IN AGREEMENT WITH THE VERDICTS.
IV. THE STATE FAILED TO PROVE ALL THE ELEMENTS OF THE CRIME OF AGGRAVATED ASSAULT.
V. THE VERDICT WAS CONTRARY TO THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
After careful consideration, we find no error in the jury's manslaughter conviction. However, because the undisputed evidence showed that Rogers was acting in necessary self-defense when the projectiles from his firearm struck the bystanders that led to his two aggravated assault convictions, we must reverse and render as to those two convictions. Accordingly, we affirm in part and reverse and render in part.

FACTS
¶ 2. This tragic case stems from events that occurred in the crowded Hilltop Lounge, a nightclub in Vicksburg, Mississippi. During the early morning hours of August 2, 2004, Rogers encountered Danny Woodland. Rogers and Woodland apparently had a history of personal conflict. The only explanation in the record indicates that the conflict was over a woman named Bonita Branson, whom both Rogers and Woodland had dated.
¶ 3. In any event, it is undisputed that Rogers and Woodland had a series of confrontations that night. Each time, bystanders separated the two. It is also undisputed that both Rogers and Woodland were armed with .45 caliber semi-automatic pistols.
¶ 4. After what became the final confrontation, Woodland turned from Rogers and began to walk away. However, Woodland suddenly turned around, faced Rogers, drew his High Point .45 caliber semi-automatic pistol, and fired at Rogers at least twice. One of Woodland's shots struck Rogers center mass in the chest. Additionally, Woodland's projectiles reportedly struck two bystanders. Woodland stopped firing when his weapon misfired.
¶ 5. Despite being shot in the chest, Rogers managed to draw his own .45 caliber semi-automatic pistol. Rogers returned fire at Woodland as Woodland tried to clear the misfire. Rogers's Ruger P-97 did not misfire. Rogers's projectiles hit two innocent bystanders. Lakeia Green received wounds to her hand and her wrist. Christopher Henderson was hit in his leg. Additionally, Rogers struck Woodland six times: once in the abdomen, twice in Woodland's left arm, once in the left buttock, once in the right buttock, and once in the head.
¶ 6. Two of those wounds were fatal the shot to Woodland's abdomen and the *796 shot to Woodland's head. However, the sequence of those shots is critical. It is undisputed that the shot to Woodland's abdomen was the first fatal wound. However, by some eyewitnesses' accounts, as he was exiting the Hilltop Lounge and while Woodland was alive but face down on the floor, Rogers approached Woodland, stood over him, and fired one to three more shots. Those eyewitnesses suggested that Rogers shot Woodland in the head during that final volley. Rogers disputed that version of events. By any recollection, expert testimony would show that the fatal shot to Woodland's head occurred after the fatal shot to Woodland's abdomen.
¶ 7. In the panic that ensued, Rogers managed to make his way out of the Hilltop Lounge. Rogers encountered Bentrisa Shelton outside the Hilltop Lounge. Bentrisa drove Rogers to the hospital.

PROCEDURAL HISTORY
¶ 8. Rogers was arrested and initially charged with murder, four counts of aggravated assault, and shooting inside a building. The Warren County grand jury, however, returned an indictment against Rogers and only charged him with manslaughter and two counts of aggravated assault. The manslaughter charge arose from the killing of Woodland. The two aggravated assault charges arose from the injuries Green and Henderson received during the initial exchange of gunfire. Rogers pleaded not guilty. On September 26, 2005, Rogers went to trial before the Warren County Circuit Court.
¶ 9. Tamela Strong, an eyewitness, testified that Woodland drew his weapon and fired at Rogers first. Rogers returned fire. As Rogers was leaving, he fired three shots in quick succession near the exit of the Hilltop Lounge. Tamela took cover and did not see Woodland as he lay on the floor. According to Tamela, she thought Woodland made it outside. However, she quickly realized that Woodland was dead because Woodland's head was touching her leg. Tamela had been dating Woodland for approximately five years, though she was unaware that he had also been seeing Bonita.
¶ 10. Tamela's sister, LaShanta Strong, also testified. LaShanta's testimony was very similar to Tamela's. LaShanta testified that Woodland fired first; Rogers returned fire; and Rogers fired three shots near the exit of the Hilltop Lounge. According to LaShanta, after Rogers's first volley of shots, she and Tamela ducked down because Rogers was coming towards them. After she ducked down, she heard three final shots. The shots hurt her ears because Rogers fired so close to her.
¶ 11. Tonya Williams testified that Woodland fired at Rogers first. She explained that she fell to the floor as soon as the firing began. She also testified that she thought she heard a third weapon being fired, but she did not see anyone else with a weapon. She got up to leave because she thought the shooting was over. Tonya testified that, at that point, she saw Rogers run to the front of the Hilltop Lounge, where he paused, stood over Woodland, and shot him while Woodland lay on the floor.
¶ 12. Green testified that Woodland fired first and that, as Rogers returned fire, she was struck in the hand. She did not see Rogers after the first volley of gunfire, but she did hear more shots being fired. At the time of Rogers's trial, she still did not have full use of her hand.
¶ 13. Henderson testified after Green. Henderson could not tell who fired first. However, he saw Rogers "slump" before he saw "fire coming from [Rogers's] gun." Henderson testified that he was struck in *797 the leg during Rogers's initial shots.[1] At that point, Henderson pulled Woodland to the ground. Woodland had been leaning on him "like a lump." Henderson went on to testify that he saw Rogers's shoes as Rogers walked towards him and Woodland. According to Henderson, Rogers stopped over them. Henderson testified that he closed his eyes and that Rogers shot once more. That last shot made his ears ring, so he did not hear anything else. When he opened his eyes, Rogers was walking over him on his way out of the Hilltop Lounge. At the time of trial, the fragmented bullet was still in his leg.
¶ 14. Latoya Reed was also an eyewitness. She testified that Woodland fired first, and Rogers returned fire. She dropped to the floor. When she looked up, she saw Rogers and Woodland running toward the door. According to Latoya, Woodland fell and, when he did, Rogers was "right there on him." Latoya testified that Rogers then shot Woodland in the head.
¶ 15. Eric Lewis testified that he was struck in the leg when he first heard shots being fired. He made his way outside and heard more shots being fired. After a few seconds of pause, he heard three more shots in quick succession. Lewis went back inside, where he saw Woodland on the floor. When Woodland did not respond to his request to "get up," Lewis took Woodland's car keys because he did not have another ride home.
¶ 16. Dr. Stephen Hayne, a forensic pathologist, performed an autopsy on Woodland. Dr. Hayne found that Woodland had six gunshot wounds. Two of those wounds were lethal. According to Dr. Hayne, the first lethal wound was to Woodland's abdomen. That shot went through Woodland's abdominal wall, perforated the small bowel at three locations, and came to rest after it struck the second lumbar vertebrae. Dr. Hayne testified that it would have taken "tens of minutes" for Woodland to die from that wound. The second lethal wound was to Woodland's head. According to Dr. Hayne, Woodland was alive when he was struck by this second lethal wound. Dr. Hayne testified that the second lethal wound entered the back of Woodland's skull and did not exit.
¶ 17. Dr. Hayne opined that the wound to Woodland's head, the wound to the back of Woodland's left arm, and the wound to Woodland's left buttock could have been inflicted while someone stood over Woodland. During cross-examination, the following exchange occurred:
Q. Now, you said that three potential wounds could have been inflicted by the remaining victim standing over the victim in the shooting?
A. Yes, sir.
Q. And that would be the left arm, the head shot, and the right buttock, right?
A. Yes, sir.
Q. If you did not have that information that the individual was lying on the floor face down, could those injuries have been inflicted in another manner?
A. It could have been, yes, sir.
Q. It could have been?
A. Yes, sir.

*798 Q. If Mr. Woodland had turned and shots were being fired, could the same result have occurred?
A. Which same result, sir?
Q. The wounds to the head, the arm, and the buttock?
A. I think if they were fired from head, arm, and buttock that, that would be highly unlikely. Because once the head gun shot wound was inflicted, the body would fall to the ground and you would no longer have trajectories of up to the ground striking the left arm and the right buttock.
Q. Well, had Mr. Woodland turned with his head this direction, that shot could have been made from behind him. Right. That would have put him on the floor?
A. That would be possible.
Q. That would be possible. So, that shot could have come from behind him somewhere?
A. It's possible, yes, sir.
Dr. Hayne also testified that Woodland possibly could have been shot in the head as he was "moving away." On redirect, Dr. Hayne testified that, assuming he was standing when he was shot in the back of the head, he could not have been shot as such if he were standing and backing away from Rogers.
¶ 18. Keithen Smith testified that, before Rogers and Woodland had their last confrontation, he saw Rogers remove his pistol and chamber a round. Woodland was not near Rogers when that occurred. According to Smith, he unsuccessfully tried to call Woodland to warn him to stay away from Rogers. When he first heard gunfire, he heard two shots. After a pause, he heard three or more shots. After a second pause, he heard two or three other final shots.
¶ 19. The prosecution next called Sergeant Virgil Woodall of the Vicksburg Police Department. Sergeant Woodall went to the Hilltop Lounge and found Woodland lying near the exit of the nightclub. Sergeant Woodall also found eight shell casings, three of which were near Woodland's head, and one live .45 caliber round. Sergeant Woodall testified that, when he first arrived at the Hilltop Lounge, he found Woodland's body near the exit. Woodland's weapon was underneath his body, but it was still in his left hand. Woodland had one round in the chamber and three rounds in the magazine. Sergeant Woodall found a spent projectile lodged in the wooden floor near Woodland's body.
¶ 20. The prosecution called Steve Byrd, the Quality Manager for the Mississippi Crime Laboratory, as its final witness for its case-in-chief. Byrd is also an expert in forensic science with a specialty in firearm and tool marks examinations. He testified in that capacity. Byrd examined eight shell casings. One came from Woodland's weapon. The other seven casings, as well as the copper jacketed projectiles, came from a different weapon.
¶ 21. After Byrd testified, Rogers unsuccessfully moved for a directed verdict. Rogers then called his own witnesses. Rogers first called Bonita. Bonita witnessed the confrontations between Rogers and Woodland. After the last verbal confrontation, she asked Woodland to take her home. Woodland declined. Instead, he walked with her a few steps, told her to get out of the way, turned towards Rogers, and started firing at him. According to Bonita, she only saw Woodland fire once, but she heard two shots and a "click." Bonita testified that, after the first shot, she got down on her hands and knees and crawled to the front of the Hilltop Lounge. She crawled up to where Woodland fell. She further testified that she saw Rogers *799 walking, but she was not certain whether he was leaving. She was not sure whether she heard any gunshots at that time.
¶ 22. Melissa Williams testified that Woodland fired at Rogers first. Melissa did not testify as to whether Rogers stood over Woodland and shot him. The prosecution did not cross-examine Melissa.
¶ 23. Bentrisa testified that she saw Woodland aim his pistol at Rogers. She explained that she got down on the ground before the shooting began, and she did not get back up until the shots stopped. She saw a body on the floor as she ran outside. When she got outside, she made her way to her car. Before she left, she saw Rogers holding his chest. Rogers gave her his keys. She took his keys, but she could not move. Bentrisa testified that her sister drove up. Rogers was able to get in the car by himself. She got in the car on the opposite side, and they went to the hospital. Bentrisa testified that neither she nor anyone else in her sister's car disposed of Rogers's weapon.
¶ 24. Rogers next called Rose Williams. Rose testified that she saw Rogers near Smith. According to Rose, Rogers never displayed a weapon to Smith and never spoke to Smith at all. Rose also testified that she did not see Smith try to call anyone on his cell phone. Rose went on to explain that she did not witness the shooting because she was in a separate part of the Hilltop Lounge.
¶ 25. Rogers took the stand as the final witness. Rogers explained that he had a history of disputes with Woodland. He testified that Woodland would get hostile if he looked in Woodland's direction. According to Rogers, he usually did not carry his pistol. Instead, he left it in his car. However, he carried his pistol that night because Woodland had threatened him. Rogers went on to explain that he did not know Woodland was at the Hilltop Lounge that night. He also testified that he did not usually keep a round chambered, but he did so on that night.
¶ 26. According to Rogers's testimony, Woodland was the aggressor that night. He said he would have avoided Woodland if he had seen him. He first noticed that Woodland was making "some kind of sign" behind his head. When he turned around, Woodland stopped. They did not speak at that time. He then went to the restroom. On his way there, he saw Smith, but he did not speak to him or otherwise interact with him in any way. However, he did speak to Rose. After he used the restroom, he went back out on the dance floor.
¶ 27. Rogers testified that, at that point, Woodland came and "got in his face." According to Rogers, as the song "Run and Tell That" played, Woodland was "bouncing in his face" as he repeatedly said "run and tell that." Rogers said Woodland was "practically" spitting on him. At that time, other people in the Hilltop Lounge separated them. Rogers testified that he never responded to Woodland except once, when he said "run and tell that" to him with authority in his voice. Rogers testified that Woodland walked away at that time.
¶ 28. Rogers then testified regarding the shooting:
Okay, and when I turn I see him. And its like hethis crowd of people that was around him, he told them, he was like, get back. Like he moved everybody back out the way. But I'm looking at him do this and I see him get the gun and hold like this. And I'm looking at him pointing the gun at me. And he drew it like this. And he kind of got down, and he just, bomb, bomb. I want to say it was two or three shots, two or three shots.
*800 Rogers explained that he was not certain at first that he had been shot. According to Rogers, he thought, "dang, this dude really, he done shot me." According to Rogers, Woodland's pistol "jammed." As Woodland crouched and tried to clear his weapon, Rogers drew his pistol, "started running straight at [Woodland]," and fired at him. Rogers continued firing until he emptied his magazine and the slide on his pistol locked back. He could not remember what happened to his pistol. Rogers did not find out that Woodland died until the following Wednesday.
¶ 29. The jury deliberated and found Rogers guilty of manslaughter and two counts of aggravated assault. After a sentencing hearing, the circuit court sentenced Rogers to twenty years for manslaughter, ten years for one aggravated assault charge, and five years for the other aggravated assault charge. The circuit court set the sentences to run consecutively, for a total of thirty-five years. After unsuccessful post-trial motions for JNOV or, alternatively, a new trial, Rogers appeals.

ANALYSIS

I. THE STATE PROVED THE CRIME OF MURDER, PREJUDICING THE JURY TO FIND THE DEFENDANT GUILTY OF MANSLAUGHTER.

II. ROGERS['S] RIGHT OF SELF[-]DEFENSE WAS TERMINATED.
¶ 30. In his first two issues, Rogers seems to allege some form of prosecutorial misconduct. In essence, Rogers argues that the prosecution "over-argued" its case. Rogers claims the prosecution improperly presented a murder case despite the fact that he was indicted for two counts of aggravated assault and one count of manslaughter. According to Rogers, "[t]he act or acts as portrayed by the prosecution lead [sic] the jury to believe that a deliberate design murder had taken place." Rogers reasons that the prosecution undercut his right to assert self-defense.
¶ 31. Rogers cites no authority that would support his argument. To be sure, Rogers cites authority regarding just when one may act in reasonable self-defense, but that authority certainly does not suggest that a prosecutor may not argue that a defendant did not act reasonably in necessary self-defense at the precise moment of a homicide. It follows that Rogers's argument is procedurally barred for a lack of relevant authority. Arguments advanced on appeal must "contain the contentions of the appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on." M.R.A.P. 28(a)(6). "Failure to comply with [Mississippi Rule of Appellate Procedure] 28(a)(6) renders an argument procedurally barred." Birrages v. Ill. Cent. R.R., 950 So.2d 188, 194 (¶ 14) (Miss. Ct.App.2006).
¶ 32. Assuming, for the sake of discussion, that Rogers was not procedurally barred, we would find no merit to his argument. The prosecution has an inherent right to counter the defense's theory of the case as long as it does so within the bounds of the evidence. Accordingly, the prosecution committed no misconduct when it argued that Rogers did not act in reasonably necessary self-defense when he shot Woodland in the back of the head.

III. THAT A JUROR WAS NOT IN AGREEMENT WITH THE VERDICTS.
¶ 33. After the circuit court clerk read the jury's verdict of guilty on all three counts, counsel for Rogers indicated that *801 he would like the circuit court to poll the jury. First, the circuit court polled each juror as to each individual charge. Juror number three responded that she did not return a guilty verdict for manslaughter, but she did find Rogers guilty of both counts of aggravated assault.[2]
¶ 34. Later, juror number three indicated that she found Rogers guilty of all three charges. Before the clerk could proceed to juror five, the circuit court stated, "Let's start back over. I want you to say instead of Count 1, 2, let's start with the charge. To the charge of Manslaughter." When the circuit court clerk again asked juror number three whether she found Rogers guilty of manslaughter, juror number three responded, "Yes." Juror number three went on to find Rogers guilty of both counts of aggravated assault. The circuit court clerk asked juror number three, "That [a verdict of `guilty'] was your verdict in all three?" Juror number three answered, "Yes."
¶35. According to Rogers, Victoria Atkins contacted his family after the trial. Atkins was a juror during his trial. Rogers claims that Atkins told his family that she was confused and pressured into returning a guilty verdict. Rogers attached a handwritten note to his motion for JNOV or, alternatively, for a new trial. That handwritten note read as follows:
The statement i[sic] made on Thursday Sept. 29, 2005 that [it is not clear whether this is a "4" or a "7"] people vote not guilty and, the reason why i[sic] said not guilty is that Reginald Roger [sic] deserve another chance in life. Another reason i[sic] also said that Reginald Roger [sic] was not guilty and then i[sic] change to guilty because i[sic] was afriad [sic] and confuse [sic]. I still says [sic] that Reginald Roger [sic] is not guilty in my point of view.
¶36. The circuit court overruled Rogers's post-trial motions. The record does not contain a transcript of the hearing on Rogers's post-trial motions, but the circuit court's order indicates that such a hearing took place on December 9, 2005. However, Rogers claims Atkins never testified because "she could not be found." Rogers concedes that a juror may not impeach her own verdict. Regardless, Rogers submits that the circuit court should have sent the jurors back to the jury room for further deliberation. According to Rogers, "[f]or the juror to seek out the family was an unusual act that smacks of impropriety ... [and] diminishes the fairness of the trial Rogers received." Rogers seems to request a new trial, as he claims he "was and is entitled to a fair trial by an impartial jury."
¶37. The State points out that the note at issue is unsworn and unauthenticated so there is no proof Atkins was the author of the note. The State further asserts that, even assuming Atkins was the author of the letter at issue, she never said the verdict was the result of misconduct or inappropriate pressure. The note employs the generic terms "afraid" and "confused" without reference to any cause for such feelings.
¶38. As the State contends, Atkins could have been "afraid" of any number of things. She could have been afraid that she would feel as though she personally sent Rogers to prison. She could have been afraid of retribution or retaliation. Without more, there is no way to know just what caused Atkins to purportedly feel afraid and confused. In any event, there is absolutely no evidence that anyone *802 in particular caused Atkins to feel afraid and confused. What is more, Rogers never moved to have the jury sent back for further deliberations. Where the circuit court did not receive an opportunity to resolve an issue, it may not be presented to this Court for the first time on appeal. Larson v. State, 957 So.2d 1005, 1017(¶ 50) (Miss.Ct.App.2006). "Fundamental to appellate review is the requirement that the trial court first be presented the issue for resolution before we accept it." Id. at 1018 (¶ 50); see M.R.A.P. 28(a)(3). As such, Rogers's argument is procedurally barred.

IV. THE STATE FAILED TO PROVE ALL THE ELEMENTS OF THE CRIME OF AGGRAVATED ASSAULT.
¶39. Rogers argues that the evidence was insufficient to find him guilty of the aggravated assault of Green or Henderson. Rogers last challenged the sufficiency of the evidence when he filed his unsuccessful motion for JNOV. McClain v. State, 625 So.2d 774, 778 (Miss. 1993). In appeals from an overruled motion for JNOV, we review the evidence in the light most favorable to the prosecution. Id. We must accept the credible evidence consistent with guilt as true, and we give the prosecution the benefit of all favorable inferences that may be reasonably drawn from the evidence. Beckum v. State, 917 So.2d 808, 813(¶ 11) (Miss.Ct.App.2005). "We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Id. (quoting McClain, 625 So.2d at 778).
¶40. Rogers submits that because he unintentionally shot Green and Henderson when he was acting in self-defense, as a matter of law, he may not be found guilty of aggravated assault. "Where there is an express intent to kill or do grievous bodily harm directed toward one person and another is killed unintentionally by the act, it is murder at common law." Dykes v. State, 232 Miss. 379, 386, 99 So.2d 602, 605-06 (1957). It follows that, where there is an express intent to kill or do grievous bodily harm to one person and another is unintentionally injured, it is an assault at common law. The reasoning behind this principle is that the law transfers the express intent from the intended victim to the unintended victim. Id. However, reason and logic dictate that when an accused, acting in necessary self-defense, intends to injure or kill the aggressor only, unintentionally injures an innocent bystander, that transferred intent does not apply because the law justifies the accused's actions towards the aggressor.
¶41. Mississippi Code Annotated section 97-3-17 addresses excusable homicide. According to section 97-3-17, a homicide may be excused "[w]hen committed by accident and misfortune in doing any lawful act by lawful means, with usual and ordinary caution, and without any unlawful intent." Miss.Code Ann. § 97-3-17(a) (Rev.2006). By extension, it follows that the same principles should apply to make an assault that does not result in death excusable under the same circumstances.
¶42. The State draws our attention to the fact that Rogers brought his weapon into the Hilltop Lounge. The State concludes that Rogers was the initial aggressor and, as such, he may not rely on transferred intent as a matter of law. We are not persuaded by the State's argument. True enough, Rogers brought his weapon into the Hilltop Lounge, but there is no evidence to suggest that Rogers was *803 the actual initial aggressor. Likewise, there is no evidence that Rogers provoked or even expected a deadly confrontation with Woodland when he went to the Hilltop Lounge. It defies common sense to suggest that because Rogers brought a weapon into the Hilltop Lounge, he had no other option than to retreat from Woodland's life-threatening attack. It would likewise defy common sense to suggest that, even if Woodland otherwise acted in necessary self-defense, because he had a weapon, he forfeited any and every available defense based on reasonable and necessary force.
¶43. The undisputed evidence indicates that Rogers and Woodland had a series of confrontations, but Woodland had walked away. However, without provocation, Woodland turned towards Rogers, drew his pistol, and shot Rogers in the chest. There can be no doubt that, at that point, Rogers had a lawful right to act in self-defense and use deadly force to repel his attacker. While there was testimony that, moments later, Rogers stood over Woodland and shot him in the head, there is no evidence that Rogers shot either Green or Henderson at that time. To hold that Rogers had no right of self-defense, under the circumstances, would be the equivalent of a finding that Woodland was justified in shooting Rogers.
¶44. We conclude, based upon a careful review of the record, that a reasonable, fair-minded juror could only find that Rogers's initial return of gunfire toward Woodland was justifiable as an act in necessary self-defense. Our conclusion is buttressed by the prosecution's own closing argument to the jury in which the prosecutor stated, "I think when Reginald Rogers responded to Danny Woodland pulling his gun and firing at Danny Woodland at that point, I think it was justified." Further, the testimony is undisputed that Green and Henderson were struck with errant bullets from Rogers's pistol when Rogers initially returned fire in an effort to repel the initial aggressorWoodland. Therefore, as a matter of law, Rogers had no unlawful intent to cause bodily injury to Green or Henderson with a deadly weapon, and he did not act recklessly under circumstances manifesting extreme indifference to the value of human life. At that moment in the conflict, Rogers was attempting to preserve his own life.
¶45. In his dissent, Chief Judge King finds that this opinion amounts to a substitution of this Court's judgment for that of the jury's. The facts do not bear out that Rogers and Woodland met with the intent to engage in consensual mutual combat. There is no evidence that Rogers expected to encounter Woodland. Chief Judge King seems to find that Rogers provoked Woodland and that Rogers forfeited his right to self-defense. Chief Judge King's reasoning fails in that provocation is, in essence, a form of heat of passion manslaughter. See Livingston v. State, 943 So.2d 66, 71(¶15) (Miss.Ct.App. 2006). Assuming there were some evidence that Rogers provoked Woodland and that Woodland survived and Rogers died, Woodland might have attempted to assert provocation to have a murder charge reduced to manslaughter. Obviously, those are not the facts. Even so, it has long been the law in Mississippi that "[m]ere words, no matter how provocative, are insufficient to reduce an intentional and unjustifiable homicide from murder to manslaughter." Tyler v. State, 784 So.2d 972, 975-76(¶12) (Miss.Ct.App.2001). The facts are entirely undisputed that Woodland drew his weapon and fired at Rogers first. Moreover, according to the prosecution's own submitted and granted jury instruction, the jury could only find Rogers guilty of aggravated assault if Rogers did *804 not act in necessary self-defense. During the prosecution's closing argument, the prosecutor stated, "I think when Reginald Rogers responded to Danny Woodland pulling his gun and firing at Danny Woodland at that point, I think it was justified." Accordingly, Chief Judge King's dissent is misplaced in that this is not a question of fact. The material facts relating to necessary self-defense were undisputed. It therefore is a question of law.
¶46. Because, as a matter of law, Rogers could not be guilty of the aggravated assault of Green or Henderson, we must reverse and render Rogers's two aggravated assault convictions. See, e.g., Pickens v. State, 229 Miss. 409, 411-12, 90 So.2d 852 (1956) (where the evidence shows, without substantial contradiction, that an accused acted in self-defense, it is appropriate to reverse, render, and discharge).

V. THE VERDICT WAS CONTRARY TO THE WEIGHT AND SUFFICIENCY OF THE EVIDENCE.
¶47. Rogers takes issue with the circuit court's decision to overrule his motion for JNOV or, alternatively, for a new trial. A motion for JNOV challenges the legal sufficiency of the evidence. McClain, 625 So.2d at 778. In appeals from an overruled motion for JNOV, we review the evidence in the light most favorable to the prosecution. Id. We must accept the credible evidence consistent with guilt as true, and we give the prosecution the benefit of all favorable inferences that may be reasonably drawn from the evidence. Beckum, 917 So.2d at 813(¶ 11). "We are authorized to reverse only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Id. (quoting McClain, 625 So.2d at 778).
¶48. A motion for a new trial, however, challenges the weight of the evidence. Beckum, 917 So.2d at 813 (¶14). The circuit court has substantial discretion in ruling on a motion for a new trial. Id. The circuit court should grant the motion only if it would result in an unconscionable injustice if the verdict was allowed to stand. Id. As we review the circuit court's decision to overrule a motion for a new trial, we must consider the evidence in the light most favorable to the verdict. Id. We are mindful that it is the jury's responsibility to resolve matters regarding the weight of the evidence and the credibility of witnesses. Id. We may only reverse the circuit court if it abused its discretion when it overruled the defendant's motion for a new trial. Id.
¶49. Rogers argues that he acted in reasonable self-defense. Rogers notes that there were varying versions of events regarding whether he displayed a weapon; however, the witnesses testified that Woodland fired first. Rogers also reasons that those witnesses would have been seeking cover when the shooting began. According to Rogers, "[w]ith so many people streaming out of the club there was a lot of talk and this influenced people in what they perceived happened." Rogers argues that Dr. Haynes's testimony provided that he could have shot Woodland as Woodland turned away. According to Rogers, "[t]he medical evidence refutes any testimony that Woodland was shot in the head while on the floor." Rogers concludes, without authority, "[t]his cannot form a basis for a conviction in a case such as the one before the Court."
¶50. Without question, Mississippi law provides for justifiable homicide. See Miss.Code Ann. § 97-3-15 (Rev.2006). Most pertinent to our present purposes, "[t]he killing of a human being by the act... of another shall be justifiable ... *805 [w]hen committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling, in any occupied vehicle, in any place of business, in any place of employment or in the immediate premises thereof in which such person shall be." Miss.Code Ann. § 97-3-15(1)(e). Homicide is also justifiable, "[w]hen committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished." Miss. Code Ann. § 97-3-15(1)(f). However, because the underlying facts were in dispute, it was for the jury to decide the question of whether Rogers, as he exited the Hilltop Lounge, acted reasonably in necessary self-defense when he shot Woodland in the head.
¶51. There was testimony from numerous witnesses that, as Rogers was leaving the Hilltop Lounge, Rogers shot Woodland in the back of the head as Woodland lay helpless on the floor. Dr. Haynes testified that, although the first shot to Woodland's abdomen was lethal, Woodland was still alive when Rogers shot him in the back of the head. The jury could have found that Rogers did not act in necessary self-defense because, at that time, Woodland did not present a reasonable threat to Rogers's life. See Davis v. State, 891 So.2d 256, 259(¶8) (Miss.Ct.App.2004) ("A reasonable, hypothetical juror could have been convinced that there was no need to continue aiming the shotgun at [the victim], as he presented no reasonably imminent threat in his unarmed, prone, and seriously wounded state.").
¶52. Essentially, the evidence of shooting Woodland in the head presented a fact question of self-defense for the jury to resolve. The jury concluded that Rogers did not act reasonably in necessary self-defense. Even if we reached a different conclusion than the jury reached, we are precluded from substituting our view of the evidence for the jury's. Id. Reasonable and rational jurors could have concluded that Rogers did not act in necessary self-defense when he fired the final shot or shots. Therefore, we cannot find that the circuit court erred when it overruled Rogers's post-trial motions incident to Rogers's manslaughter conviction.
¶53. THE JUDGMENT OF THE WARREN COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, MANSLAUGHTER, AND SENTENCE OF TWENTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. THE JUDGMENT OF THE WARREN COUNTY CIRCUIT COURT OF CONVICTION OF COUNT II AND COUNT III, AGGRAVATED ASSAULT, AND SENTENCES OF TEN YEARS AND FIVE YEARS, RESPECTIVELY, TO RUN CONSECUTIVELY TO COUNT I, IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
IRVING, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR. KING, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY LEE, P.J. AND CHANDLER, J. LEE, P.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY MYERS, P.J. AND CHANDLER, J.
KING, C.J., Concurring in part, Dissenting in part:
¶54. I join the majority in affirming Rogers's manslaughter conviction. However, *806 I dissent to that portion of the majority opinion which holds that as a matter of law, Rogers could not be guilty of aggravated assault. I believe that the question of whether Rogers committed aggravated assault is one of fact and not of law. The jury is the finder of fact. Dean v. State, 746 So.2d 891, 895(¶10) (Miss.Ct.App. 1998). Where there is evidence to support the jury's factual findings, this Court is obligated to accept them. Bullard v. State, 923 So.2d 1043, 1048(¶18) (Miss.Ct. App.2005).
¶55. I believe that the record contains sufficient evidence to support the jury's factual determinations. I, therefore, believe that in order to reverse and render the aggravated assault convictions, the majority improperly substitutes its fact finding for that of the jury's.
¶56. Rogers was charged with aggravated assault pursuant to section 97-3-7(2)(a) of the Mississippi Code Annotated, which provides "[a] person is guilty of aggravated assault if he attempts to cause serious bodily injury to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." Miss.Code Ann. § 97-3-7(2)(a) (Rev. 2006). The indictment against Rogers charged that he "did purposely, knowingly or recklessly cause serious bodily injury to Lakeia Green under circumstances manifesting extreme indifference to human life, to-wit: by discharging a weapon in a public place wounding her in the right hand...."
¶57. The majority opinion infers that there was no intent, either actual or transferred, to injure Lakeia Green, and therefore, Rogers cannot be guilty of aggravated assault. A conviction under the aggravated assault statute is not solely dependent upon the intent of the offending party. Mississippi Code Annotated section 97-3-7(2)(a) provides for the possibility of an aggravated assault conviction for injury resulting from conduct which is either: (1) purposeful, (2) knowing, or (3) reckless. An aggravated assault conviction for conduct which is either purposeful or knowing does require an element of intent. Morris v. State, 748 So.2d 143, 146 (¶¶10-11) (Miss.1999). However, reckless conduct does not require intent. Nobles v. State, 464 So.2d 1151, 1154 (Miss.1985).
¶58. There is no question as to whether Lakeia Green suffered serious bodily injury. There is a question as to whether under the circumstances, the conduct, which caused Green's injury, was reckless. The resolution of that question requires a finding of fact as opposed to the finding of law as determined by the majority. That finding of fact is within the province of the jury rather than the province of this Court.
¶59. The testimony presented to the jury was that there was long-standing ill will between Rogers and Woodland. On the day of this incident, Woodland was already in the club near the bar when Rogers entered the club. Rogers seemed focused on going to the area of the bar where Woodland was. Rogers bumped into Woodland, after which the two of them exchanged words. Rogers raised his shirt to show that he was armed with a pistol. Woodland then raised his shirt to reveal that he was also armed with a pistol.
¶60. It is true that Rogers was entitled to take reasonable steps to defend himself after Woodland opened fire. However, what is reasonable is a question of fact, which must be considered in light of the overall circumstances. This is particularly true where innocent parties are injured in the process. The jury was entitled to consider: (1) that there was pre-existing ill *807 will between Rogers and Woodland; (2) that Rogers approached and deliberately bumped into Woodland; (3) that as a result, Rogers and Woodland exchanged words; (4) that Rogers raised his shirt to reveal a pistol; (5) that Woodland then raised his shirt to also reveal a pistol; and (6) that Woodland walked away and then turned and fired at Rogers.
¶61. The jury was entitled to conclude from these circumstances that Rogers's conduct was at the least a proximate cause, if not the proximate cause, of his need to defend himself. As such, the jury could also reasonably conclude that Rogers's actions were reckless. If the jury could reasonably conclude that Rogers's actions were reckless, then it could also reasonably find him guilty of aggravated assault.
¶62. The jury properly made these findings of fact, and this Court is obligated to respect those findings of fact. Bullard, 923 So.2d at 1048(¶18). Because the majority opinion substitutes its findings of fact for those of the jury, I dissent and would affirm this case in toto.
¶63. The author of the majority opinion has adopted a very myopic reading of the record in order to justify what I see as an unsound opinion.
¶64. The writer of the majority opinion quotes from the prosecutor's closing argument to prove that the issue in this case is one of law rather than fact. That quote reads, "I think when Reginald Rogers responded to Danny Woodland[,] pulling his gun and firing at Danny Woodland[,] at that point, I think it was justified." The writer of the majority opinion clearly shares that view. However, that view, whether espoused by the writer of the majority opinion or by the prosecutor is not evidence. Havard v. State, 928 So.2d 771, 791(¶35) (Miss.2006). A jury is obligated to decide a case based solely upon the evidence, not the argument of counsel. Wright v. State, 805 So.2d 577, 581(¶11) (Miss.Ct.App.2001). Having embraced as evidence that which is not evidence, the writer of the majority opinion uses that to simply declare this issue is to be a matter of law and proceeds to resolve it in accordance with his wishes.
¶65. The writer of the majority opinion would hold that a claim of self-defense is so absolute that it trumps all other matters. This position is not supported in the majority opinion by citation to case law, which advances that point of view. I would suggest that the right of self-defense is not so absolute as to allow for the reckless injury of innocent bystanders. It is the question of recklessness that is a question of fact as opposed to a question of law. In deciding this question of fact, the jury is entitled to give due consideration to all relevant evidence. They did so in this case and found Rogers guilty of aggravated assault.
¶66. The analysis that I have performed for the aggravated assault on Green, would be essentially identical for the aggravated assault on Christopher Henderson. For these reasons, I would affirm the verdict on both counts of aggravated assault.
LEE, P.J. AND CHANDLER, J., JOIN THIS OPINION.
LEE, P.J., Concurring in part, Dissenting in part:
¶67. With respect to the majority, I do not agree that the evidence was insufficient to find Rogers guilty of aggravated assault; therefore, I must dissent on this issue. The majority finds that Rogers was acting in self-defense when he unintentionally shot two bystanders; thus, he cannot be guilty of aggravated assault. To reiterate our standard of review, this Court can *808 reverse a conviction "only where, with respect to one or more of the elements of the offense charged, the evidence so considered is such that reasonable and fair-minded jurors could only find the accused not guilty." Beckum v. State, 917 So.2d 808, 813(¶11) (Miss.Ct.App.2005). I find that there was sufficient evidence for "reasonable and fair-minded jurors" to find that Rogers was guilty of aggravated assault. Rogers testified that he intentionally walked into the Hilltop Lounge that night carrying a loaded gun with a live round in the chamber. Prior to that night, Rogers and Woodland had been involved in an ongoing dispute over a woman. Witnesses testified that both Rogers and Woodland were engaged in several confrontations in the club prior to the shooting, the first initiated by Rogers. Upon entering the club, Rogers immediately went to Woodland, intentionally bumped into him, and exchanged words with him. There was testimony from two witnesses that Woodland asked Rogers to "Let it go," before Rogers showed Woodland his gun. Woodland turned away; he then drew his gun and fired at Rogers.
¶68. Rogers chose to confront Woodland in a crowded bar. By showing Woodland his gun, Rogers was demonstrating that he was ready for battle. The majority takes the position that Rogers was acting in self-defense because Woodland fired his weapon first. I disagree. Rogers and Woodland were intent on doing battle with total disregard for the welfare of innocent bystanders. Rogers was only "defending" himself because Woodland was, in essence, the fastest draw in this gunfight. Woodland has paid the ultimate price for his actionsdeath. Rogers, who was equally responsible, has been found guilty by a jury. Whether Rogers had reasonable cause to apprehend danger to his life or limb at the time of the killing was a factual inquiry left to the jury. Day v. State, 589 So.2d 637, 642 (Miss.1991) (citing King v. State, 65 Miss. 576, 582, 5 So. 97, 97 (1888)). The jury believed that Rogers came to the club armed with a deadly weapon, looking for trouble. I agree with the jury's verdict. Rogers was not just defending himself; he was an aggressor who should be held responsible. I would, therefore, affirm Rogers's aggravated assault convictions.
MYERS, P.J., AND CHANDLER, J., JOIN THIS OPINION.
NOTES
[1] During direct examination, Henderson testified, "And I turned back around and they were shooting. Fire was going on. By that time I heard one shot. I turned around and I said that, you know, with the `F,' and then I see Mr. Rogers slump like that. He was slump like to his right, which would be his left. That is when I seen fire coming from his gun. And that is when I got hit."
[2] We infer that juror number three was a woman because the clerk asked juror number three, "Ma'am, was that your verdict in count 1?"