# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00830-COA

**EARENE WILLIAMS**                                                                    **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                              **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/25/2024 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| COURT FROM WHICH APPEALED: | BOLIVAR COUNTY CIRCUIT COURT, SECOND JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/21/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.	After showing up armed at the home of his girlfriend's cousin, a man was charged with shooting the cousin with a firearm. He was convicted of aggravated assault. On appeal, he claims the evidence was insufficient to convict him, as he did not intend to shoot the cousin, but someone else. He also contends the jury should not have been instructed on the doctrine of transferred intent. Finding no error, we affirm.

## STATEMENT OF FACTS

¶2.	Earene Williams was living at a house with his girlfriend. Their electricity bill was in her cousin LeSarah Branch's name. At some point, LeSarah contacted the electric company

and had the power shut off at Williams' house.

¶3.     Williams was angry and sent LeSarah messages over Facebook arguing with her about the lights being cut off. LeSarah would later testify that Williams "threatened my life. He told me he didn't care if I put on pants or a dress for my funeral."

¶4.     After LeSarah got off work later that day, she drove to her sister Devarshay Branch's house. When she arrived, Devarshay was sitting on the porch with her friend Cedrick and his boyfriend. LeSarah started talking to Devarshay and telling her about the Facebook messages from Williams.

¶5.     As the pair were talking in the front yard, Williams walked out from the side of Devarshay's house. When he came around the corner, he was holding a gun and shouting at LeSarah. LeSarah walked towards Devarshay's front door, but Williams followed her. As Devarshay stepped in between them attempting to get Williams to leave, he reached over her and punched LeSarah in the head. LeSarah stumbled across the threshold of the front door into the house. Testimony would later show she grabbed her gun and said, "I'm fixing to kill this b****."

¶6.     Williams heard LeSarah's comment and saw her reach for her gun. He fired his gun three or four times in the direction of the front door, near where LeSarah and Devarshay were standing. According to LeSarah, when she stepped back out onto the porch to return fire, Devarshay was standing to her left, and Williams had ducked behind the neighbor's fence to her right. Devarshay had been shot in the leg during this sequence of events. She crawled

2

toward the parking lot, and LeSarah took her to the hospital.

## PROCEDURAL HISTORY

¶7.    A grand jury later indicted Williams for one count of aggravated assault against

Devarshay, with a firearm enhancement, and one count of possession of a firearm by a felon.

The trial court later issued an order to nolle prosequi the charge for possessing a firearm.

¶8.    At trial, the prosecution presented testimony from several witnesses, including

Cedrick, LeSarah, and Devarshay.[1]

¶9.    Cedrick explained how he saw Williams first punch one sister and then shoot the

other.

> [Cedrick]:    I see [LeSarah] coming through the doorway, and I see Earene
> hit her. . . . But once he hit her with his fist, I just hear her say,
> 'I'm about to kill this b**** a** n****.'
> . . . .
> [Cedrick]:    So, like, by the time she got her gun up to turn around, you
> know, he instantly started letting his shots off.
> . . . .
> [State]:      Were there any gunshots before that time?
> [Cedrick]:    No, ma'am.

The witness likewise explained how he believed Devarshay was trying to de-escalate the

situation.

> [Cedrick]:    Now, to my knowledge, Devarshay at this point was in between
> them, you know, because she was after he hit her, like she tried
> to get between them to stop them from fighting and shooting, or
> whatever. . . . So when he hit her sister, you know, she moved,

---

[1] The State also presented testimony from the responding officer, an investigator with
the police department, and a cousin of Williams.

3

was escalating. She was just trying to get in the middle of them to keep from escalating more.

¶10. LeSarah testified that when Williams came around the corner, she heard him "saying, 'Here I go, b****,'" and saw that "he ha[d] a silver gun with a black handle in his hand already." She "threw [her] hands up" and said to him, "I'm not fixing to play with you with no gun." LeSarah explained, "[A]s I'm saying that, I'm still walking toward my sister['s] door," meanwhile Devarshay "is telling him to go on" and leave. She stated Williams then "reaches over [Devarshay] and hit me in the left side of my head with the gun."

¶11. LeSarah testified, "I stumbled, and I catch her door, her doorknob. He knocked my glasses off. So as I'm getting up, I pull my gun from my side. I hear three, four shots come off."

¶12. The jury heard Devarshay testify that Williams shot her.

[State]: Ms. Devarshay, being that you've testified that Earene [Williams] was shooting and that your sister was shooting, do you know which one shot you?
[Devarshay]: Yes, ma'am.
[State]: Which one shot you?
[Devarshay]: Earene.
[State]: And how do you know that it was Earene that shot you?
[Devarshay]: Because he was the only one shooting at the time.
. . . .
[Devarshay]: . . . When he hear her [LeSarah] say that she's fixing to kill this b**** [Williams], that's when he got to shooting. He seen her pull her gun from off the side of her. That's when he got to start shooting. . . .

Devarshay was adamant that it was Williams who shot first and who shot her.

[State]: At what point did you get shot? . . . .

4

[Devarshay]: When he started shooting, it was probably like the third or fourth bullet when he was shooting, that's when I had got hit. When . . . LeSarah fixing to get ready to come back out, she was like, 'Move.' I'm like, 'I'm shot,' or whatnot.

. . . .

[State]: So at the point that your sister came out and started shooting toward him, toward your neighbor's apartment, had you already been shot?

[Devarshay]: I was already shot. Yes, ma'am.

¶13. After the State rested its case-in-chief, Williams moved for a directed verdict arguing the investigator "just testified that there's no evidence of what bullet or what gun passed through Devarshay Branch's leg. *They simply do not know who shot her* . . . and the evidence is not there on that." (Emphasis added). Given the testimony at trial, the court denied the motion.

¶14. Williams then testified in his own defense. His core theory was that he did not shoot first and did not shoot the victim. Indeed, Williams testified he was merely "defending himself." His belief was that Devershay "gets in between" him and LeSarah.

[Williams]: Me and LeSarah still arguing. She's standing at the doorway. As she was getting ready to lift her gun like she was fixing to shoot me, my reaction just I struck her. I hit her in the head.

. . . .

[Williams]: . . . Devarshay was pushing me. She started pushing me, like, 'Get out in front of my house. You wrong.'

. . . .

[Williams]: . . . And I'm like, 'No. Tell her to give me my money.' Next thing I know, pow, pow, pow, pow, pow, pow. She starts shooting. Me and Devarshay still standing there. She starts shooting.

[Defense]: Who?

[Williams]: LeSarah, she starts shooting. . . .

5

The defendant emphasized his story that LeSarah shot first.

> [Williams]: LeSarah come back out the house, boom, boom, boom, boom, boom, boom, boom. That's when I first fired my gun. I shot three times. The gun jammed up. She kept shooting, running behind me.
>
> . . . .
>
> [Williams]: I shot at her after she shot at me. I was defending myself.
>
> . . . .
>
> [Williams]: . . . She was shot. I knew I hadn't shot my gun. The only reason my gun was fired . . . I shot back. I was defending myself. I shot three or four times.

¶15. Both parties rested their case. The jury convicted Williams of aggravated assault. The trial court sentenced Williams to twelve years in custody, with four years suspended and eight years to serve. The trial court denied Williams' motion for judgment notwithstanding the verdict or a new trial, and Williams appealed.

## DISCUSSION

¶16. On appeal, Williams raises three issues. Two are focused on a jury instruction on the doctrine of transferred intent. He also claims there was insufficient evidence to support the conviction. Finding no error, we affirm.

### I. The jury instruction on transferred intent was not improper.

¶17. Williams takes issue with a jury instruction on transferred intent. He argues Instruction C-12 "erroneously" stated the law and constructively amended his indictment. Further, he claims that the doctrine of transferred intent does not apply to his case, so it was error for the trial court to give the instruction.

¶18. "Jury instructions are generally within the discretion of the trial court, and the settled

6

standard of review is abuse of discretion." *Robinson v. State*, 324 So. 3d 1137, 1143 (¶19) (Miss. Ct. App. 2021) (quoting *Johnson v. State*, 252 So. 3d 597, 599 (¶8) (Miss. Ct. App. 2017)). For this Court "[t]o determine 'whether error lies in granting or refusing a jury instruction, the instructions actually given must be read as a whole and in context.'" *Arnold v. State*, 393 So. 3d 1096, 1104 (¶18) (Miss. Ct. App. 2024) (quoting *Clark v. State*, 343 So. 3d 943, 985-86 (¶183) (Miss. 2022)). "If the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Tutwiler v. State*, 197 So. 3d 418, 425 (¶30) (Miss. Ct. App. 2015) (quoting *Lawrence v. State*, 3 So. 3d 754, 758 (¶19) (Miss. Ct. App. 2008)).

¶19.    Williams argues Instruction C-12 was "confusing and contradictory" based on its use of the phrase "not in necessary self-defense." More specifically, he claims this language instructed the jury to consider self-defense only as to Devarshay and not as to LeSarah, arguing he was defending himself against LeSarah.

¶20.    The State contends that Williams "never objected, however, to the language being confusing or contradictory," and "[b]ecause he failed to make that specific objection, it is barred from appellate review." During the jury instruction conference, Williams' attorney made an objection to the giving of a transferred intent instruction, stating, "As for the language of it, is it an accurate statement of the law or the State of Mississippi? I don't know."

¶21.    In turn, the trial court noted, "I understand you object in general to a transferred intent

7

instruction." But the court stated, "I'm going to give a transferred intent instruction," finding that "it's applicable here. And I don't think it has to be spelled out in the Indictment." Because defense counsel raised his concerns with the instruction and the trial court had an opportunity to respond, we find Williams sufficiently preserved this issue for appeal. *See Johnson v. State*, 290 So. 3d 1232, 1242 (¶46) (Miss. 2020).

¶22.   Instruction C-12 stated:

> Mississippi recognizes the doctrine of transferred intent. That is, if an individual has formed the necessary intent to commit an aggravated assault against one person but in attempting to commit such aggravated assault against one person but in attempting to commit such aggravated assault mistakenly injures another, the doctrine of transferred intent applies, and the actor's intent is transferred to the injured party. If you find beyond a reasonable doubt that the defendant, Earene Williams, intended to shoot LeSarah Branch but in attempting to do so mistakenly shot Devarshay Branch and such shooting was *not in necessary self-defense* then the intent to shoot LeSarah Branch is transferred to Devarshay Branch and you should consider that when considering the other instructions in this case.

(Emphasis added).

¶23.   Transferred intent is based on the idea that our "law transfers the express intent from the intended victim to the unintended victim." *Rogers v. State*, 994 So. 2d 792, 802 (¶40) (Miss. Ct. App. 2008). Importantly, "[t]he doctrine is applicable to the crime of assault." *Craig v. State*, 201 So. 3d 1108, 1112 (¶12) (Miss. Ct. App. 2016) (quoting *Hitt v. State*, 988 So. 2d 939, 942 (¶12) (Miss. Ct. App. 2008)). For instance, "if A, intending to strike B, misses him and strikes C, or if mistaking C for B, he strikes him, he is in either case guilty of an assault and battery on C." *Id*. (quoting *Hitt*, 988 So. 2d at 942 (¶12)).

8

¶24.   Contrary to Williams' assertions, the language used in the instruction properly advised the jury on the definition of transferred intent, the doctrine's application to the crime of aggravated assault, and its exception for necessary self-defense. Therefore, we find that Instruction C-12 fairly announced the law of transferred intent.

¶25.   Furthermore, the instruction also tracked the evidence at trial. To some extent, Williams argues that "the doctrine of transferred intent does not apply in this case" because "[he] was acting in reasonable self-defense when he fired shots at LeSarah after LeSarah, with her hand on her gun, threatened to kill Williams."

¶26.   Under our caselaw, when a defendant "acting in ***necessary*** self-defense[] intends to injure or kill the aggressor only, [and] unintentionally injures an innocent bystander, that transferred intent does not apply because the law justifies the accused's actions towards the aggressor." *Rogers*, 994 So. 2d at 802 (¶40) (emphasis added).

¶27.   First, the trial court made a ruling that specifically found the transferred intent doctrine applicable. During the jury instruction conference, the following exchange occurred:

| | |
|---|---|
| [Court]: | I mean, your client has testified he was acting in self-defense. |
| [Defense]: | But not with regard to this victim. She's already shot. |
| [Court]: | Well, it doesn't matter. He's testified he was acting in self defense. |
| | . . . . |
| [Court]: | . . . Do we need an instruction on transferred intent? |
| [State]: | That's what I was approaching to have that discussion. It may be necessary for clarity for the jury . . . . |
| | . . . . |
| [Defense]: | I object to the giving of a transferred intent jury instruction . . . . [W]e don't have notice of a transferred intent State theory of prosecution . . . . |

[Court]:    . . . I understand you object in general to a transferred intent instruction. I'm going to give a transferred intent instruction. I think it's applicable here.

¶28.    Second, testimony from Devarshay, LeSarah, and another eyewitness supports finding Williams was the aggressor and fired his gun first. Therefore, the trial court did not err by including a transferred intent instruction.

## II.    The indictment was not constructively amended by the jury instruction on transferred intent.

¶29.    Next, Williams claims Instruction C-12 constructively amended his indictment. He alleges the instruction on transferred intent "effectively eliminated the language of 'purposely or knowingly' in the indictment." Essentially, Williams alleges this "allow[ed] the jury to convict Williams of aggravated assault of Devarshay Branch under a theory of transferred intent" instead of "purposely or knowingly."

¶30.    "A jury instruction constructively amends an indictment if it 'broadens the grounds upon which the defendant may be found guilty of the offense charged so that the defendant may be convicted *without proof of the elements alleged* by the grand jury in its indictment." *Clark*, 343 So. 3d at 999 (¶267) (emphasis added) (quoting *Bell v. State*, 725 So. 2d 836, 855 (Miss. 1998)).

¶31.    Williams' indictment charged that he "did unlawfully, willfully, feloniously, purposely or knowingly cause bodily injury to Devarshay Branch with a deadly weapon, to-wit: a firearm, by shooting her[.]"

¶32.    To reiterate, Instruction C-12 advised the jury: "If you find beyond a reasonable doubt

10

that the defendant, Earene Williams, intended to shoot LeSarah Branch but in attempting to do so mistakenly shot Devarshay Branch and such shooting was not in necessary self-defense then the intent to shoot LeSarah Branch is transferred to Devarshay Branch *and you should consider that when considering the other instructions in this case*." (Emphasis added).

¶33. Importantly here, Instruction C-12 is *not* an elements instruction. This instruction does not inform the jury of the proof required to find Williams guilty of aggravated assault. The record shows that a *different* jury instruction contained the necessary elements of aggravated assault.

¶34. Specifically, the jury was also given Instruction C-13, which provided the following explanation:

> The defendant, EARENE WILLIAMS, has been charged by an indictment with the crime of Aggravated Assault. If you find from the evidence in this case beyond a reasonable doubt that:
>
> 1. On or about April 18, 2023, within the Second Judicial District of Bolivar County, Mississippi, the defendant, EARENE WILLIAMS,
> 2. did unlawfully, wilfully and feloniously, and purposely or knowingly cause bodily injury to Devarshay Branch, with a deadly weapon, to-wit: a firearm,
> 3. by shooting the said Devarshay Branch, and not in necessary self-defense,
>
> then you shall find the defendant guilty of Aggravated Assault. If the State has failed to prove any one or more of the above elements beyond a reasonable doubt, then you shall find the defendant not guilty.

¶35. We recently discussed a similar issue in *Arnold v. State*, 393 So. 3d 1096, 1107 (¶26) (Miss. Ct. App. 2024). In that case, Arnold was indicted for attempted kidnapping. *Id.* at

11

1101 (¶1). At trial, the jury was given "Instruction S-1A" and "Instruction S-2A," which "stated the elements of attempted kidnapping," including: "Arnold unlawfully designed and endeavored to commit the crime of kidnapping[.]" *Id*. at 1105 n.3. The trial court also gave "Instruction S-3A," which provided: "The Court instructs the Jury that 'kidnapping' as used in these instructions includes the attempt to confine a child under the age of sixteen (16) years against the will of the child's parents or legal guardians." *Id*. at 1106 n.5.

¶36. Arnold's complaint on appeal "focuse[d] on two words in the S-3A instruction—'attempt' and 'confine,'" and he argued "the language complained of in S-3A constructively amend[ed] his indictment." *Id*. at 1106 (¶¶25-26).[2]

¶37. On review, we noted "the information contained in S-3A is *not an elements instruction* informing the jury of the proof required to find Arnold guilty of the crime for which he was indicted." *Id*. at 1107 (¶27) (emphasis added). Rather, "the trial court characterized the content of S-3A as 'a legal explanation of those terms of art' in the essential elements instructions outlined in S-1A and S-2A." *Id*. Consequently, we found that "the comparison of language in S-3A to the language in Arnold's indictment [did] not reflect an actual variance that would constructively amend his indictment." *Id*.

¶38. Just as in *Arnold*, the guidance Instruction C-12 provided to the jury is better

---

[2] "Because he was indicted under the 'attempt' statute, the elements that must be proved include '(1) a design or endeavor to commit an offense, (2) an overt act toward commission thereof, and (3) a failure to consummate the act.'" *Arnold*, 393 So. 3d at 1107 (¶27) (quoting *Scott v. State*, 231 So. 3d 1024, 1035 (¶38) (Miss. Ct. App. 2016)).

12

characterized as "a legal explanation of those terms of art" included in the essential elements outlined in Instruction C-13. *Id.* at (¶26). Stated differently, Instruction C-12 gave the jury further guidance on the "purposely or knowingly" component of Williams' aggravated assault charge. Therefore, Instruction C-12 "does not reflect an actual variance that constructively amended his indictment." *Id.*

¶39.    Furthermore, "[e]ven if this Court were to find that the indictment could be affected by the contents of [Instruction C-12], 'not all variances between the indictment and instructions constitute a constructive amendment.'" *Id.* at (¶28) (quoting *Morton v. State*, 246 So. 3d 895, 903 (¶20) (Miss. Ct. App. 2017)). "[T]he central question is whether the variance is such as to substantially alter the elements of proof necessary for a conviction." *Id.* (quoting *Clark*, 343 So. 3d at 999 (¶268)).

¶40.    Williams was indicted for aggravated assault under Mississippi Code Annotated section 97-3-7(2)(ii) (Rev. 2020). "[T]o prove aggravated assault, in the manner charged here, the State has to prove two elements—that the defendant (1) attempted to cause or purposely or knowingly caused bodily injury to another (2) with a deadly weapon." *Duke v. State*, 146 So. 3d 401, 405-06 (¶16) (Miss. Ct. App. 2014) (citing Miss. Code Ann. § 97-3-7(2)(a)(ii) (Supp. 2013)).

¶41.    Even if Instruction C-12 resulted in a variance from Williams' indictment, there was not a material difference in the terms. The instructions given still required the jury to find beyond a reasonable doubt that Williams purposely or knowingly caused bodily injury to

13

Devarshay with a deadly weapon. *See Arnold*, 393 So. 3d at 1107 (¶29) ("the essence of the charged offense remained the same, as the instruction still required the jury to find beyond a reasonable doubt that Arnold attempted to kidnap N.L., a minor child under the age of sixteen, against the will of his parents").

¶42. Consequently, we find that the language of Instruction C-12 did not contain a variance such that it substantially altered the requisite elements of aggravated assault and constructively amended his indictment.

### III. The evidence was sufficient to support his conviction.

¶43. Next, Williams challenges the sufficiency of the evidence supporting his conviction. Specifically, he argues the State failed "to prove the element of intent" required for aggravated assault. He claims the evidence presented at trial did not show that he "purposely or knowingly caused bodily injury to Devarshay." Expanding on his contention, Williams asserts that "determining who fired the shot that hit Devarshay is all but impossible," and because "Williams lacked any intent to bring bodily harm to *Devarshay*," "the state's evidence was insufficient." (Emphasis added).

¶44. We review the trial court's denial of judgment notwithstanding the verdict de novo. *Id*. at 1108 (¶32). "When addressing the legal sufficiency of a conviction, we must determine whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt[.]'" *Nabors v. State*, 409 So. 3d 1190, 1195 (¶16) (Miss. Ct. App. 2025) (quoting *Potts v. State*, 233 So. 3d 782, 790 (¶¶30-31) (Miss. 2017)). "[I]n doing so,

14

we assess 'the evidence in the light most favorable to the prosecution.'" *Id*. (quoting *Potts*, 233 So. 3d at 790 (¶¶30-31)). And "[a]ll evidence supporting a guilty verdict is accepted as true, and the prosecution must be given the benefit of all reasonable inferences that can be reasonably drawn from the evidence." *Arnold*, 393 So. 3d at 1108 (¶32) (quoting *Sullivan v. State*, 281 So. 3d 1146, 1161 (¶35) (Miss. Ct. App. 2019)).

¶45.    Again, for the crime of aggravated assault, "the State has to prove two elements—that the defendant (1) attempted to cause or purposely or knowingly caused bodily injury to another (2) with a deadly weapon." *Duke*, 146 So. 3d at 405-06 (¶16) (citing Miss. Code Ann. § 97-3-7(2)(a)(ii) (Supp. 2013)).

¶46.    "[T]he State need not prove that the defendant had formed the specific purpose of inflicting bodily injury on his victim in order to convict." *Griffin v. State*, 872 So. 2d 90, 91 (¶4) (Miss. Ct. App. 2004). Instead, "the prosecution must simply show that *the blow itself was purposely inflicted and that the requisite bodily injury resulted.*" *Id*. (emphasis added).[3] "The presumption of the law is that each person intends the natural consequences of his actions." *Shaw v. State*, 139 So. 3d 79, 84 (¶13) (Miss. Ct. App. 2013) (quoting *Staten v. State*, 813 So. 2d 775, 777 (¶8) (Miss. Ct. App. 2002)).

¶47.    In this case, there is no dispute that Devarshay was shot and injured by a deadly weapon. The only other element then was whether it was Williams who "purposely or

---

[3] Ultimately, "[t]he jury is free to infer intent from the defendant's 'acts coupled with the surrounding facts and circumstances.'" *Arnold*, 393 So. 3d at 1108 (¶34) (quoting *Stewart v. State*, 839 So. 2d 535, 539 (¶19) (Miss. Ct. App. 2002)).

knowingly caused" the injury. So the question on appeal is whether sufficient evidence existed for a rational jury to find that Williams "purposely or knowingly" caused Devarshay's gunshot wound.

¶48. Williams' theory of defense at trial was that LeSarah had shot and injured Devarshay and that he fired his gun only to defend himself after LeSarah shot at him. Yet, on appeal, Williams' arguments seem to shift from this defense theory to him now claiming "it is unclear whose gun fired the shot that hit Devarshay," and "determining who fired the sho[t] that hit Devarshay is all but impossible."

¶49. First, the victim in this case specifically and unequivocally identified Williams as her attacker. Next, Devarshay, LeSarah, and Cedrick all testified that *Williams* was the first person to fire a gun that day. They each also stated that LeSarah had not fired her gun until after Williams' first shots. LeSarah also identified Williams as the shooter, stating he fired "with his eyes closed. He was shooting like this the whole time. That's how he end up hitting my sister."

¶50. Here, the State had to prove that Williams knowingly caused bodily injury to another person with a deadly weapon. Devarshay, LeSarah, and Cedrick all testified Williams was the initial aggressor and shot first. While Williams claimed otherwise, the jury found their testimonies to be more credible than his testimony. "The fact that competing inferences could be drawn from the surrounding facts is of no concern when the issue is sufficiency of the evidence; any conflict is for the jury to resolve." *Winn v. State*, 127 So. 3d 289, 292 (¶11)

16

(Miss. Ct. App. 2013) (quoting *Goff v. State*, 14 So. 3d 625, 650 (¶97) (Miss. 2009)).

¶51.    After review, we find that the State produced sufficient evidence for the jury to convict Williams of aggravated assault.

## CONCLUSION

¶52.    For the reasons above, we affirm the judgment of conviction against Williams.

¶53.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**